2006 WY 97

**John Kenneth LOPEZ, Appellant (Defendant),**

v.

**The STATE of Wyoming, Appellee (Plaintiff).**

**No. 05–106.**

Supreme Court of Wyoming.

Aug. 4, 2006.

Representing Appellant: Kenneth Koski, State Public Defender; Donna D. Domonkos, Appellate Counsel; and Marion Yoder, Senior Assistant Public Defender. Argument by Ms. Yoder.

Representing Appellee: Patrick J. Crank, Wyoming Attorney General; Paul S. Rehurek, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; and James Michael Causey, Assistant Attorney General. Argument by Mr. Causey.

Before VOIGT, C.J., and GOLDEN, HILL *, KITE, and BURKE, JJ.

HILL, Justice.

[¶ 1] Appellant, John Kenneth Lopez (Lopez), was convicted of voluntary manslaughter and of being an habitual criminal. He was sentenced to a term of 10 to 15 years of imprisonment, with credit for all time served. Lopez contends that there was insufficient proof of each element of the offense of voluntary manslaughter, that the jury was not properly instructed on the elements of voluntary manslaughter, and that the State's introduction of an habitual criminal charge, in this retrial after reversal of Lopez's original conviction, was improper and vindictive and that the State failed to satisfactorily prove the habitual criminal charge beyond a reasonable doubt in any event. We will affirm.

## ISSUES

[¶ 2] Lopez raises these issues:

I. Whether each element of the offense charged was properly established.

II. Whether the jury was properly instructed on the elements of voluntary manslaughter.

* Chief Justice at time of oral argument.

III. Whether the State properly sought and proved the habitual criminal allegation.

The State rephrases the issues only slightly:

I. Did sufficient evidence exist to convict [Lopez] of voluntary manslaughter?

II. Did the district court properly instruct the jury on the elements of voluntary manslaughter?

III. Was [Lopez] subjected to vindictive prosecution, and was the habitual criminal allegation properly proven?

## FACTS AND PROCEEDINGS

[¶ 3] The event which led to the criminal charges against Lopez occurred on December 18, 1999. A jury found him guilty of second degree murder on November 15, 2000. A sentence of 20 to 40 years of imprisonment was imposed on February 8, 2001. A notice of appeal was filed on March 2, 2001.

[¶ 4] In an opinion issued by this Court on March 24, 2004, we concluded, *inter alia*, that there was insufficient evidence that Lopez acted maliciously in striking the victim of his crime, Robert Herman (victim), and that Lopez's trial counsel was ineffective in defending his client. *Lopez v. State*, 2004 WY 28, 86 P.3d 851 (Wyo.2004). Although we will, of course, focus solely on the facts proved at his second trial in resolving the issues raised in the instant appeal, we set out below the facts from Lopez's first appeal to provide background for what follows. As we analyze the issues in this appeal, we will focus our attention on any variations on the evidence adduced at the first trial with the evidence adduced at the second trial. We take note at this juncture that the principal difference between the evidence at the first trial, and that of the second, is that three expert witnesses testified as to the cause(s) of the victim's death, whereas at the first trial, Lopez did not have the benefit of expert testimony on that issue.

After getting off work, Lopez began drinking heavily at the Albuquerque Apartments in Casper with a number of friends sometime after 3:00 a.m. on the

morning of December 18, 1999. Lopez and the victim, Robert Herman, were good friends, and Lopez was aware that Herman suffered from chronic alcoholism. According to defense theory, Lopez became upset that Herman was drinking whiskey and told him to stop drinking before he killed himself. Herman pushed Lopez, and Lopez slapped Herman on his head with an open hand and pushed him back down onto a couch. Which hand Lopez used to strike Herman was hotly disputed at trial, and witnesses' testimony about which hand was used was conflicting.

The slap was inflicted about 11:00 a.m. on December 18, 1999. After receiving the slap, Herman went to the post office with a friend, but complained of a headache and returned to his apartment at about 12:30 p.m. Herman's girlfriend and at least one friend entered the apartment through an open backdoor during the afternoon. Late that evening, Herman had locked all doors, and his friends tried to rouse him to answer either the telephone or the door but were unable to do so. By 9:00 p.m., the friends were sufficiently worried to break into the apartment. They found Herman, face down on the floor by his bed, unconscious, and bleeding from the nose and mouth.

Herman was rushed to the hospital but died the next evening, December 19, at about 9:30 p.m., almost thirty-four hours after Lopez struck him. After emergency room medical staff observed trauma to the left side of Herman's head, the police were notified and began an investigation about midnight on the 19th. Police investigators learned of an altercation, and an eyewitness testified that Lopez had struck Herman once with his open left hand on the right side of Herman's head earlier that morning. Another witness testified that he heard a smacking sound and then saw Herman falling back onto the couch and Lopez had his left hand up. The witness assumed that Lopez had "open-handed" Herman to the "right side of the head." Police encountered Lopez at Herman's apartment complex, and Lopez admitted striking Herman during an argument. Police then asked Lopez to go to the police

station for an interview. During a recorded portion of the police interview, Lopez admitted to delivering a stiff arm to Herman's face. Police officer Malone testified that, during an unrecorded portion of the police interview, Lopez admitted to hitting Herman once on the right side of his face; however, Lopez demonstrated how he hit Herman and, during that demonstration, Lopez indicated that he had struck Herman once with his right stiff arm to the left side of Herman's face. Lopez' motion to suppress his statements to police was denied.

The same night that police were receiving statements from Lopez and witnesses that Lopez had struck Herman hours earlier, evidence technicians notified police investigators that Herman had marks on his body that appeared to be boot marks; however, police uncovered no evidence that Lopez had kicked Herman. Dr. Thorpen, the coroner, prepared an autopsy report stating that Herman died from "assaultive trauma to head" that was caused after "subject struck on head by hand of known assailant." The autopsy was conducted on December 21, 1999, two days after death and after police had interviewed Lopez. Dr. Thorpen testified that Lopez was the "known assailant" listed as the cause of death and also testified that his conclusions as to how the death had occurred were based on police reports. Lopez was charged with second degree murder on January 3, 2000, and arrested the next day.

At trial, Dr. Thorpen testified as the State's last witness. He testified that the cause of death was a blood clot on the right side of the brain that resulted from a blow administered to the left temple [FN. 1: According to testimony at the evidentiary hearing by defense expert Dr. Larkin, this injury is known as a countercoup blow.]. Dr. Thorpen stated that Herman had numerous health problems that made him susceptible to death by the slap and had previously been treated for dilated veins caused by chronic alcoholism and a previous head injury. Dr. Thorpen conceded that Herman was found on the floor, had a

blood alcohol content of .215, and had veins so fragile they could easily rupture from sudden movement. However, Dr. Thorpen would not concede that it was possible that a fall had caused Herman's fatal injury because Herman had been found on a padded carpeted surface.

No evidence at trial indicated that Lopez was aware that Herman possessed these physical weaknesses. Lopez contended that he had pushed Herman in self-defense and the slap was not the fatal blow. Lopez also contended that, between the time that he struck Herman and the death hours later, the fatal blow was caused by an intruder/robber who kicked him with boots. Lopez contended that some of Herman's possessions were missing. In both opening statement and closing argument, the State conceded that Lopez had no intent to kill Herman by slapping him but, by striking the single blow in anger, had committed second degree murder. The verdict form included a charge of voluntary manslaughter.

Defense counsel had requested that the public defender pay for an expert but, before trial, had withdrawn the motion to further research the law, did not renew the motion, and, ultimately, no defense expert testified. Lopez was convicted of second degree murder, his motion for new trial was denied, and his appeal followed. After the public defender was substituted for retained counsel on appeal, it was contended that trial defense counsel had been ineffective for failing to present expert testimony on the issue of causation. This Court granted a partial remand for an evidentiary hearing on the issue of ineffective assistance of trial counsel.

At that hearing, Lopez presented an expert witness, Dr. Larkin, a forensic pathologist from North Carolina. Dr. Larkin testified that because Lopez' slap had not caused immediate bruising and swelling, it was not the fatal blow. Those injuries were apparent later that evening, and it was Dr. Larkin's opinion that the injuries that Dr. Thorpen concluded were caused by a slap were actually caused by a fall.

Before the evidentiary hearing, the State had objected to Dr. Larkin's testimony primarily because he had not reviewed the microscopic tissue slides from the autopsy. Because of time and financial constraints of the public defender and the poor health of Dr. Larkin, the defense had arranged for Dr. Larkin to testify by telephone. The State also objected to receiving Dr. Larkin's testimony by telephone; however, the district court allowed it. Dr. Thorpen, the coroner who had testified at trial, also testified at the evidentiary hearing, and he, too, contended that Dr. Larkin's conclusions were suspect because Dr. Larkin had not reviewed the microscopic slides from the autopsy. Upon inquiry, the record shows that Dr. Thorpen and the district attorney had decided that Dr. Thorpen would not provide those slides to Dr. Larkin for his review and, despite Dr. Larkin's several requests for the tissue slides, he was not provided with them.

Upon cross-examination, Dr. Larkin stated that examination of the microscopic tissue slides was very important to rendering an opinion. Because Dr. Larkin had been denied access to those slides, his opinion was a "provisional or a limited" opinion. Dr. Larkin, however, believed that the slides would confirm that Herman's fatal head injury was caused by a fall.

At the conclusion of the evidentiary hearing, the trial court ruled that Lopez had failed in his burden of proof and had not been denied effective assistance of counsel. Our discussion of the evidentiary hearing sets out further details. Briefing on the ineffectiveness decision was then filed, and this appeal resumed.

*Lopez*, ¶¶ 4–14, 86 P.3d at 855–57. Ultimately, we concluded that Lopez's conviction for the crime of second degree murder had to be reversed because there was insufficient evidence to prove that Lopez acted maliciously, as required by the elements of second degree murder, as well as because defense counsel was ineffective for failing to present expert evidence at trial on the issue of causation. *Id.*, at ¶ 42, 86 P.3d at 862–63.

[¶ 5] On April 22, 2004, an amended information was filed in the district court charging Lopez with voluntary manslaughter. On May 4, 2004, the State filed an amended information also charging Lopez as an habitual offender. On September 27, 2004, Lopez's second trial got underway. On September 30, 2004, the jury reached its verdict finding Lopez guilty of voluntary manslaughter, and on October 1, 2004, the jury found him to be an habitual criminal. Judgment and Sentence were entered on January 31, 2005, and a notice of appeal was filed on February 7, 2005. This matter was argued to the Court on March 15, 2006, and, thereafter, taken under advisement.

## DISCUSSION

### Sufficiency of the Evidence

■ [¶ 6] In addressing a claim of insufficiency of the evidence, we must determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. When considering a claim of the sufficiency of the evidence, we review that evidence with the assumption that the evidence of the prevailing party is true, disregard the evidence favoring the unsuccessful party, and give the prevailing party the benefit of every favorable inference that we may reasonably draw from the evidence. We will not re-weigh the evidence nor will we re-examine the credibility of the witnesses. *Perritt v. State,* 2005 WY 121, ¶ 9, 120 P.3d 181, 186 (Wyo.2005); *Lopez,* ¶ 16, 86 P.3d at 857.

■ [¶ 7] Lopez was tried for the crime of voluntary manslaughter, under Wyo. Stat. Ann. § 6–2–105(a)(i) (Lexis 1999) (the language of that statute is the same in the 2005 version of Wyoming Statutes Annotated):

§ 6–2–105. Manslaughter; penalty.

(a) A person is guilty of manslaughter if he unlawfully kills any human being without malice, expressed or implied, either:

(i) Voluntarily, upon a sudden heat of passion; or

(ii) Involuntarily, but recklessly except under circumstances constituting a violation of W.S. 6–2–106(b).

(b) Manslaughter is a felony punishable by imprisonment in the penitentiary for not more than twenty (20) years.

[¶ 8] The jury was given this elements instruction:

INSTRUCTION NO. 7

The elements of the crime of Voluntary Manslaughter, as charged in this case, are:

1. On or about the 18th day of December, 1999
2. In Natrona County, Wyoming
3. The Defendant, John K. Lopez
4. Voluntarily
5. Upon a sudden heat of passion
6. Killed another person, Robert J. Herman.

If you find from your consideration of all the evidence that each of these elements has been proved beyond a reasonable doubt, then you should find the Defendant guilty.

If, one [sic] the other hand, you find from your consideration of all the evidence that any of these elements has not been proved beyond a reasonable doubt, then you should find the Defendant not guilty.

[¶ 9] This issue turns upon which of the witnesses the jury decided were the most believable. Although the room in which these events occurred was small and there were several persons present, surprisingly there really were only two "eye-witnesses," Lopez and William Chapin. All of the witnesses, as well as the victim, had been drinking—some more than others. Lopez asserted that the victim was drunk. Lopez characterized what he did to the victim like this: "When he comes up and pushes me again, I shoved him off underneath the chin to sit him back on the couch, and I told him to stay there." Lopez also characterized his actions as a "touch," a "shove," and a "grab," and he conceded that he was angry with the victim when he did so. Although our further recitation of the evidence will demonstrate that Lopez's actions were described as a "stiff-arm"[1] delivered with some consider-

---

1. The word "stiff-arm" was not defined for the jury, although the record ably demonstrates that

able force, Lopez specifically denied that, but then later conceded that he had described it that way himself.

[¶ 10] Although his testimony at the retrial differed in some respects from his testimony at the first trial, James W. Thorpen, M.D. (pathologist and Natrona County Coroner) testified that the cause of the victim's death was the blow delivered by Lopez. Michael J. Dobersen, M.D. (forensic pathologist), who is the Medical Examiner for Arapahoe County, Colorado, testified as a rebuttal witness for the State and concurred with the conclusion reached by Dr. Thorpen and disagreed with the opinions given by the expert who testified during Lopez's presentation of his evidence. Daniel Spitz, M.D. (pathologist and Chief Medical Examiner for Macomb County, Michigan), testified as an expert for the defense. It was his opinion that the victim died as the result of an accidental fall (which is common among alcoholics) and that the fall occurred only a few hours before his death.

[¶ 11] William Chapin testified that he heard an argument and went to see what was going on. Chapin related that Lopez and the victim were, "... having words. And then there was a swing from [Lopez] to [the victim]." Chapin related that the blow hit the victim on the right side of his face (whereas the experts and some other witnesses testified that the fatal blow was delivered to the left side of the victim's head). Still angry, Lopez asked the victim to return a watch he had given to him. Lopez proceeded to stomp on that watch and then threw it back to the victim. Later in his testimony, Chapin described and demonstrated the force with which the stiff-arm blow was delivered and the record reflects that it was delivered with some considerable force. When interviewed by the Casper Police Department, Lopez told (and demonstrated on the wall of the inter-

view room) Casper police officer Chris Malone the nature of the blow he delivered to the victim. Officer Malone provided this testimony at trial: "It was a stiff-arm maneuver like this, the palm—heel palm strike. And, you know, it is definitely a different kind of wall.[2] It was a sheet rock wall, and it literally vibrated the wall in the interview room. So it was sufficient force, and he told us it was sufficient to knock him down."

[¶ 12] Perhaps of central importance in this retrial was the testimony of three expert witnesses. The State's theory of the case was that the victim died as a direct result of the stiff-arm blow delivered by Lopez. That blow was delivered seven or eight hours before the victim was found collapsed in his apartment and 34 hours before his death. Lopez contended that it was much more likely that the victim died from injuries he suffered in an unobserved fall that occurred only a few hours before friends found him on the floor in his apartment. Natrona County Coroner, James W. Thorpen, M.D., agreed that an accidental fall could not be ruled out, but he concluded that the cause of death in light of all the facts available to him was blunt force trauma to the head.

[¶ 13] The essence of Lopez's argument in this appeal, as well as to the jury below, is that the victim was his best friend and that he did not act "voluntarily, upon a sudden heat of passion." Indeed, Lopez contended that it was the victim who was drunk and angry, and Lopez confronted him only out of concern for his health, i.e., because he was drinking whiskey when he knew he should not because of his compromised physical condition resulting from his chronic alcoholism. Furthermore, it was Lopez's contention that although he did "touch" the victim in some manner, that it was not that action that caused the victim's death, i.e., the exact cause of the victim's death is not known but the

---

the action taken by Lopez against the victim was demonstrated at least twice for the jury. "Stiff-arm" (synonymous with "straight-arm") is found in the dictionary and is defined thus: "an act or instance of warding off a football tackler with the arm fully extended from the shoulder, elbow locked, and the palm of the hand placed firmly against any part of his body—called also *stiff-arm*." Merriam–Webster's Collegiate Dictionary, 1155, 1161 (10th ed.1999); Webster's Third New

International Dictionary, 2254 ("to ward off (an opponent) with or as if with a straight-arm.") (1986); and see *www.m-w.com/dictionary/stiff-arm*.

2. Officer Malone did a repeat demonstration of Lopez's demonstration in the courtroom, hence the "different kind of wall" comment.

most likely cause was a fall that occurred many hours after the confrontation described above.

[¶ 14]   In addition to the elements instruction recited above, the jury was instructed as to the meaning of "voluntarily," and "heat of passion:"

INSTRUCTION NO. 8

"Voluntarily" means that the act which caused death was done intentionally.   It does not require that the act was done with the intention of killing.

INSTRUCTION NO. 9

As used in instruction number 7, voluntarily does mean intentionally.   It denotes the condition of the mind at the time of the homicide and distinguishes a "voluntary" act from one which occurs by accident.   In this respect, the function of the phrase "voluntarily, but upon a sudden heat of passion" is similar to "purposely."

INSTRUCTION NO. 10

"Heat of passion" means such passion as naturally would be aroused in the mind of an ordinarily reasonable person in the same or similar circumstances as those in question which would cause him to act rashly, without reflection or deliberation, and from passion rather than from judgment.   The heat of passion must be aroused suddenly, and the act resulting in death must occur while the defendant was acting under the direct and immediate influence of such heat of passion, and before sufficient time has elapsed to permit the heat of passion to cool.

[¶ 15]   In addition to those instructions set out above, the jury was also instructed that it could consider the lesser included offense of criminally negligent homicide.   Criminally negligent homicide is defined in Wyo. Stat. Ann. § 6–2–107 (Lexis 1999):

§ 6–2–107.   Criminally negligent homicide.

(a) Except under circumstances constituting a violation of W.S. 6–2–106, a person is guilty of criminally negligent homicide if he causes the death of another person by conduct amounting to criminal negligence.

(b) Criminally negligent homicide is a misdemeanor punishable by imprisonment for not more than one (1) year, a fine of not more than two thousand dollars ($2,000.00), or both.

[¶ 16]   It is our conclusion that there was evidence from which the jury could find each of the elements of voluntary manslaughter, and that they did so in light of the lesser included offense instruction.   Although Lopez's theory is certainly a plausible one, the governing standard of review leads us to the ineluctable conclusion that the jury could properly conclude that he was guilty.

## Adequacy of the Instructions

[¶ 17]   Our perception is that Lopez's contentions with respect to the adequacy of the instructions are closely intertwined with his contention that the evidence was insufficient, i.e., that the instructions did not fully comprehend the nuances of this unique crime.   Nonetheless, the standard of review generally applicable to this issue is well known:

The applicable standard of review is well-established: Jury instructions should inform the jurors concerning the applicable law so that they can apply that law to their findings with respect to the material facts; instructions should be written with the particular facts and legal theories of each case in mind and often differ from case to case since any one of several instructional options may be legally correct; a failure to give an instruction on an essential element of a criminal offense is fundamental error, as is a confusing or misleading instruction; and the test of whether a jury has been properly instructed on the necessary elements of a crime is whether the instructions leave no doubt as to the circumstances under which the crime can be found to have been committed.   *Mueller v. State*, 2001 WY 134, ¶ 9, 36 P.3d 1151, ¶ 9 (Wyo.2001).

*Burkhardt v. State*, 2005 WY 96, ¶ 12, 117 P.3d 1219, 1223 (Wyo.2005); also see *Siler v. State*, 2005 WY 73, ¶¶ 44–45, 115 P.3d 14, 35–36 (Wyo.2005).

[¶ 18]   Lopez made no objection to the instructions given below, indeed his requests for instructions were largely honored.

Thus we review this assertion of error under the plain error standard ("First, the record must clearly present the incident alleged to be error. Second, appellant must demonstrate that a clear and unequivocal rule of law was violated in a clear and obvious, not merely arguable, way. Last, the appellant must prove that he was denied a substantial right resulting in material prejudice to him."). *Siler* at ¶ 45, 115 P.3d at 36 (quoting *Ogden v. State*, 2001 WY 109, ¶ 9, 34 P.3d 271, 274 (Wyo.201)).

[¶ 19] We have carefully examined Lopez's general argument in this regard, and in particular the cases, *United States v. Serawop*, 410 F.3d 656, 660–66 (10th Cir.2005) (holding that to convict a defendant of the federal crime of voluntary manslaughter, government must prove beyond a reasonable doubt that he acted in the heat of passion with either a general intent to kill, intent to do serious bodily injury, or depraved heart indifference; and that federal homicide statutes fail to articulate expressly what mental states are required for each of the various offenses), and *Stice v. State*, 799 P.2d 1204, 1209 (Wyo.1990) (affirming district court's acceptance of guilty plea in a case involving attempted voluntary manslaughter). Neither case is pertinent to the case at hand.

[¶ 20] Our task is fairly narrow with respect to this issue, and we conclude that Lopez has failed to demonstrate plain error with respect to the instructions given to the jury.

## Habitual Criminal—Vindictive Prosecution

[¶ 21] The applicable standard of review has been summarized in many cases:

In reviewing claims of vindictive prosecution, we have adopted this method:

A defendant has the burden of proof and must establish either (1) actual vindictiveness, or (2) a realistic likelihood of vindictiveness which will give rise to a presumption of vindictiveness. Thereafter, the burden shifts to the prosecution to justify its decision with legitimate, articulable, objective reasons. If the defendant does not meet his burden of proof, however, the district court need

not reach the government justification issue.

*Whiteplume v. State*, 874 P.2d 893, 896 (Wyo.1994) (*quoting United States v. Raymer*, 941 F.2d 1031, 1040 (10th Cir.1991)).

We have discussed the concept of vindictive prosecutions in other cases, and in one involving a conspiracy prosecution after a conviction for the actual offense was reversed for lack of a speedy trial, we said:

Where a defendant has exercised a legal right and the government responds in a way that punishes him for taking such action, an improper vindictive motive is presumed. *United States v. Goodwin*, 457 U.S. 368, 373–74, 102 S.Ct. 2485, 2488–89, 73 L.Ed.2d 74 (1982). The presumption arises when the government acts by imposing increased charges, such as changing a charge from a misdemeanor to a felony or subjecting him to the possibility of greater sentence or in some other way "upping the ante." *Blackledge v. Perry*, 417 U.S. 21, 28, 94 S.Ct. 2098, 2102–03, 40 L.Ed.2d 628 (1974); *North Carolina v. Pearce*, 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969).

A decision to prosecute for other crimes committed does not necessarily result in a finding of vindictiveness. Here, the conspiracy charges did not result in a greater imposition of a penalty than Phillips received at the earlier trial on separate charges. *See Blackledge*, 417 U.S. at 28, 94 S.Ct. at 2103. *Cf. Lane v. Lord*, 815 F.2d 876, 879 (2nd Cir.1987) (adding a conspiracy charge in new trial after declaration of a mistrial not vindictive). The conspiracy and the substantive charges were two separate components in a continuing criminal episode. We have held that requiring the actor to take responsibility for each criminal act in the episode following successful appeal does not constitute vindictive prosecution even when consecutive life sentences result. *Osborn v. State*, 806 P.2d 259, 264–65 (Wyo.1991).

Charging decisions rest within the discretion of the prosecutor. *Billis v. State*, 800 P.2d 401, 417 (Wyo.1990). A charging decision is not improper unless it results solely from the defendant's exercise of a protected legal right, rather than the pros-

ecutor's normal assessment of the societal interest in prosecution. *Goodwin*, 457 U.S. at 380, n. 11, 102 S.Ct. at 2492, n. 11. The public's demand for prosecution for the additional crimes may figure into the prosecutor's assessment without it resulting in vindictiveness. *Hardwick v. Doolittle*, 558 F.2d 292, 301 (5th Cir.1977). We cannot conclude nor can we allow the presumption that prosecutorial vindictiveness was involved in the decision to bring and prosecute conspiracy charges against Phillips.
*Phillips v. State*, 835 P.2d 1062, 1070 (Wyo. 1992).

*Merchant v. State*, 4 P.3d 184, 192–93 (Wyo. 2000); also see *Swanson v. State*, 981 P.2d 475, 477–79 (Wyo.1999); *Crozier v. State*, 882 P.2d 1230, 1233–35 (Wyo.1994); and see generally 1 Robert W. Cipes, *Criminal Defense Techniques*, § 6A.05[6] Prosecutorial Vindictiveness (2004).

[¶ 22] As we read the record, this issue was clearly joined in the trial court, and the presiding judge at least tacitly indicated that the burden had shifted to the prosecution to negate a presumption of vindictiveness. The prosecutor responded that the charge was not more serious than the original offense. The potential penalty under the original charge was 20 years to life, and the potential penalty in the new circumstances was less than that. The State's action merely required Lopez to take responsibility for each criminal act in the episode that resulted in the original appeal, i.e., "requiring the defendant to take responsibility for his criminal past does not also constitute vindictive prosecution." Moreover, the prosecutor argued that charging Lopez as an habitual criminal in the original proceeding would have been moot, as there would have been no purpose in enhancing a life sentence. Finally, had the original charge been voluntary manslaughter, there is no certainty that the prosecutor might not have pursued an enhanced sentence because of the seriousness of Lopez's actions in this case and the seriousness of his past record.

[¶ 23] Following this detailed consideration of the circumstances presented by this case, the district court determined that the State had met its burden. We conclude that the district court did not abuse its discretion or otherwise err as a matter of law in not disallowing the amendment to the information.

## Habitual Criminal—Sufficiency of the Evidence

[¶ 24] Lopez also contends that the evidence that supported the jury's conclusion that he was an habitual criminal is not sufficient. We apply the same standard of review as that which we applied to analyze the sufficiency of the evidence of the substantive charge of voluntary manslaughter. However, we see little need for detailed analysis. The documentation the prosecution relied upon may not have been of the highest and best possible certainty. The admission or exclusion of evidence is in the discretion of the district court, and the defendant bears the burden of establishing that the district court abused its discretion. *KP v. State*, 2004 WY 165, ¶ 12, 102 P.3d 217, 221 (Wyo. 2004). Lopez's arguments as to the level of authenticity of the documents applied only to the weight to be given those documents, a matter to be argued to the jury. We conclude that the district court did not err in admitting the evidence of Lopez's prior convictions and that that evidence was sufficient to sustain the jury's finding of guilt.

## CONCLUSION

[¶ 25] The evidence presented at trial was sufficient to sustain both the finding of guilt of voluntary manslaughter and Lopez's status as an habitual offender. The jury was properly instructed as to the elements of voluntary manslaughter. The amendment of the information to include an habitual criminal charge did not constitute vindictive prosecution. The judgment and sentence of the district court are affirmed in all respects.