2007 WY 57

**Aubrey McCLELLAND, Appellant (Defendant),**

v.

**The STATE of Wyoming, Appellee (Plaintiff).**

**No. 05–280.**

Supreme Court of Wyoming.

April 10, 2007.

Representing Appellant: Kenneth M. Koski, State Public Defender; Donna D. Domonkos, Appellate Counsel; and Tina N. Kerin, Senior Assistant Appellate Counsel. Argument by Ms. Kerin.

Representing Appellee: Patrick J. Crank, Wyoming Attorney General; D. Michael Pauling, Senior Assistant Attorney General; and Paul S. Rehurek, Deputy Attorney General. Argument by Mr. Rehurek.

Before VOIGT, C.J., and GOLDEN, HILL, KITE, and BURKE, JJ.

HILL, Justice.

[¶1] Appellant, Aubrey McClelland (McClelland), was convicted of one count of aggravated robbery in violation of Wyo. Stat. Ann. §§ 6-2-401(a)(ii) and (c)(ii) (LexisNexis

2005)[1] and of being a habitual criminal under Wyo. Stat. Ann. § 6–10–201 (LexisNexis 2005).[2] In a judgment and sentence entered on September 30, 2005, McClelland was sentenced to life in prison based on the habitual criminal, sentence enhancement statute (five prior felonies). McClelland asserts that: The district court erred in denying his motion to suppress evidence seized from his residence; that the district court abused its discretion by allowing inadmissible evidence to be adduced during the habitual criminal phase of his trial; and that a series of errors, to which by and large no objections were made, resulted in cumulative error mandating reversal of his conviction. We will affirm.

## ISSUES

[¶ 2] McClelland raises these issues:

1. **§ 6–2–401. Robbery; aggravated robbery; penalties.**
 (a) **A person is guilty of robbery if in the course of committing a crime defined by W.S. 6–3–402 he:**
 (i) Inflicts bodily injury upon another; or
 (ii) **Threatens another with or intentionally puts him in fear of immediate bodily injury.**
 (b) Except as provided in subsection (c) of this section, robbery is a felony punishable by imprisonment for not more than ten (10) years.
 (c) **Aggravated robbery is a felony punishable by imprisonment for not less than five (5) years nor more than twenty-five (25) years if in the course of committing the crime of robbery the person:**
 (i) Intentionally inflicts or attempts to inflict serious bodily injury; or
 (ii) **Uses or exhibits a deadly weapon or a simulated deadly weapon.**
 (d) As used in this section "in the course of committing the crime" includes the time during which an attempt to commit the crime or in which flight after the attempt or commission occurred. [Emphases added.]
 **§ 6–3–402. Larceny; livestock rustling; penalties.**
 (a) A person who steals, takes and carries, leads or drives away property of another with intent to deprive the owner or lawful possessor is guilty of larceny.
 (b) A bailee, a public servant as defined by W.S. 6–5–101(a)(vi) or any person entrusted with the control, care or custody of any money or other property who, with intent to steal or to deprive the owner of the property, converts the property to his own or another's use is guilty of larceny.
 (c) Except as provided by subsection (e) of this section, larceny is:

I. Whether there was invalid consent authorizing the search of [McClelland's] residence?

II. Whether inadmissible, improperly adduced evidence was admitted during the habitual phase of [McClelland's] trial?

III. Did cumulative error occur in [McClelland's] trial?

The State presents these arguments:

I. Does the recent United States Supreme Court decision in *Georgia v. Randolph*, 547 U.S. 103, 126 S.Ct. 1515, 164 L.Ed.2d 208 (2006), render the consensual search of Kimberly Brown's apartment unlawful?

II. Did the district court err by admitting into evidence the State's documentary evidence related to [McClelland's] habitual criminal status, as against objections based on chain of custody and authenticity?

 (i) A felony punishable by imprisonment for not more than ten (10) years, a fine of not more than ten thousand dollars ($10,000.00), or both, if the value of the property is one thousand dollars ($1,000.00) or more; or
 (ii) Repealed by Laws 1984, ch. 44, § 3.
 (iii) A misdemeanor punishable by imprisonment for not more than six (6) months, a fine of not more than seven hundred fifty dollars ($750.00), or both, if the value of the property is less than one thousand dollars ($1,000.00).
 (d) Conduct denoted larceny in this section constitutes a single offense embracing the separate crimes formerly known as larceny, larceny by bailee or embezzlement.
 (e) A person who steals any horse, mule, sheep, cattle, buffalo or swine is guilty of livestock rustling which is a felony punishable by imprisonment for not more than ten (10) years, a fine of not more than ten thousand dollars ($10,000.00), or both.

2. **§ 6–10–201. "Habitual criminal" defined; penalties.**
 (a) A person is an habitual criminal if:
 (i) He is convicted of a violent felony; and
 (ii) He has been convicted of a felony on two (2) or more previous charges separately brought and tried which arose out of separate occurrences in this state or elsewhere.
 (b) An habitual criminal shall be punished by imprisonment for:
 (i) Not less than ten (10) years nor more than fifty (50) years, if he has two (2) previous convictions;
 (ii) Life, if he has three (3) or more previous convictions.

III. Does the doctrine of cumulative error warrant reversal of [McClelland's] conviction?

### FACTS AND PROCEEDINGS

[¶ 3] By information filed on November 2, 2004, McClelland was charged with aggravated robbery. No motion to suppress evidence was filed by McClelland in the trial court.

[¶ 4] On the evening of October 31, 2004, Gale Gillespie was at work as manager of the Blockbuster Video store in Sheridan. A half hour or so before the store's closing time of midnight, a person entered the store wearing a full-head gorilla mask, as well as black pants, black coat, black gloves, and black shoes. Because it was Halloween, neither Gillespie nor her fellow employee, Luke Johnson, were surprised by that. Indeed, Johnson himself was wearing a Halloween costume. The "Gorilla" asked about two movies, "Van Helsing" and "The Day after Tomorrow." Shortly after the "Gorilla's" arrival, Gillespie looked over to where Johnson was working and saw that the "Gorilla" was holding a pistol to Johnson's head. Johnson confirmed Gillespie's testimony and related how, suddenly, after pointing out the locations of "The Day After Tomorrow" and "Van Helsing," he felt a pistol in his ear. The "Gorilla," now obviously a robber, was about 5′ 5″ tall and weighed about 150 pounds. Gillespie could also tell that the robber was black because she could see his nose through the large nostril holes in the mask and see that his skin was black. In addition, emphasizing that she did not want to connote racial prejudice (because she said she was not), Gillespie indicated that she thought the robber was black because of his voice intonation. Under cross-examination, she testified that one of her "ex's" was an African–American and that she had been around black people quite a bit when she lived in Maine for two months. Johnson also identified the robber as a black male.

[¶ 5] Gillespie took all the money from the store's main cash register and put it in a black "shaving kit case" that the robber put on the counter for that purpose. A black shaving kit seized as evidence in this case was later identified by Gillespie as like the one used in the robbery. After obtaining the money from the cash register, the robber asked about the store's safe. Initially, Gillespie denied having the code for the safe. The robber cocked the pistol, and Johnson told Gillespie to do as the robber asked. Gillespie then went to the store office and retrieved a bag of "petty cash" (but not the money from the safe) and placed it in the black shaving kit. In total, Gillespie put about $500.00 in cash into the shaving kit. After the last batch of cash was placed into the black bag, the robber told both Gillespie and Johnson to lie face-down on the floor of the office, to stay there, and not "dare to get up." Johnson testified that he heard what sounded like a "large vehicle" departing after the robber left. When the employees were certain the robber was gone, Gillespie pulled a nearby phone down onto the floor, called 911, and locked the door to the office.

[¶ 6] Police officers arrived a short time later, and when Gillespie was assured by the 911 operator that it was police officers knocking on the office door, she opened it. Both Gillespie and Johnson described the incident to the police officers. During the course of the discussion, Johnson mentioned the name of Kim Brown, and that caused Gillespie to say that she knew who the robber was. Gillespie knew Brown from high school and had worked with her at another location in Sheridan. Brown patronized the Blockbuster store regularly and on several recent occasions was there with her "boyfriend," who was a black male about the same height and weight as the robber. Gillespie also recognized the robber's voice to some extent. Brown's account history at Blockbuster showed that she and her boyfriend had rented "The Day After Tomorrow" and "Van Helsing" in the recent past.

[¶ 7] Also of note is that one of the items retrieved as evidence in the investigation of this case was a gorilla mask. During her testimony, Gillespie identified it as the mask worn by McClelland the night of the robbery. In addition, she also identified the black coat McClelland wore, as well as the pistol he carried. Johnson also identified the mask, the coat worn by McClelland, and the black shaving kit, but he did not see the pistol.

Johnson also identified McClelland as the man who came in with Kim Brown to rent movies.

[¶ 8] As the facts eventually developed, Kim Brown was an accessory to the robbery committed by her boyfriend McClelland. From the very outset of the investigation of this case, he was the prime suspect, and the source of much of the information pointing to McClelland was from John Brown. John Brown was employed as a Sheridan County Deputy Sheriff at the time of the robbery. He was married to Kim Brown, although they were separated at the time this crime was committed. During the period of their separation, John was aware that his wife was meeting men on the internet and that one of those men, McClelland, had moved to Sheridan to live with her. John had seen McClelland with his wife together in public, and commented during his testimony that he looked like a "thug." The defense attorney immediately objected and the district court commented that he would allow McClelland's attorney to "sort that out in cross." Brown had made his feelings about McClelland known to fellow police officers, and in the minutes after the robbery had been committed, he received a call from a fellow police officer and was asked to provide a description of McClelland, his wife's vehicle make, model, and plate number, and her home address. Because he was receiving many calls from bill collectors, Officer Brown presumed his wife was having financial problems, and later evidence bore that out. The night of the robbery, he drove by his wife's apartment shortly after 11:00 p.m., after he got off work, and her vehicle was not there.

[¶ 9] Sergeant Allen Thompson of the Sheridan Police Department was dispatched to the Blockbuster store at 11:20 p.m. on October 31, 2004. He and Patrol Officer Brian McPhillips were the first policemen on the scene. It was Thompson who came to the door of the office in the Blockbuster store and got Gillespie and Johnson to come out of the locked office. The two store clerks were questioned separately at first, "[t]o make sure it was not something other than a suspect that robbed the store." During the questioning, it became obvious to the police

that both employees were very distressed and upset. Officer Thompson turned the investigation over to Detectives Chris Cook and Tom Henry. Almost immediately, the investigation focused on McClelland and Kim Brown. Officer McPhillips went to Brown's apartment and found her Suburban vehicle parked there. He could feel that its engine was warm and through a window he could see what looked like a black pistol inside the vehicle. Thompson also went to that location and saw the pistol in Brown's vehicle, as well as a black shaving kit and a pair of black shoes inside the Suburban. There was much other police activity going on during the time period immediately after the robbery, and more detail about that came from other witnesses, as follows.

[¶ 10] One of the main points of Officer Thompson's testimony was to relate that after a period of observation of Brown's apartment and vehicle, Brown and McClelland came out of the apartment they were sharing. The police immediately made contact with them and separated them for questioning. During the interrogations, the police officers discovered that both Brown and McClelland had cell phones and they could possibly overhear what was being said, so the officers required that both cell phones be shut off. Shortly after that, Officer Henry told Officer Bennett that McClelland committed the robbery and that Officer Bennett was to arrest McClelland and take him to jail. That night Brown's vehicle was impounded and placed in the police department evidence storage building, awaiting issuance of a search warrant.

[¶ 11] Officer McPhillips was also at the location of Brown's apartment, and while Officer Thompson was with McClelland, he was with Brown. Brown consented to allow the police detectives to search the apartment which she was sharing with McClelland at that time. Some cash in denominations similar to those taken in the robbery was recovered from that apartment, as well as other evidence linked to the crime (e.g., the coat that McClelland wore). The gorilla mask and a second BB pistol were found in a storage closet in a quasi-public area near Brown's apartment.

[¶ 12] Detective Chris Cook of the Sheridan Police Department testified that the investigators were able to ascertain that the cash stolen consisted of one, one-hundred dollar bill, multiple twenties, tens and fives, two bundles of 25 one-dollar bills each, one loose stack of 25 one dollar bills, another batch of 24 one-dollar bills, and a batch of unbundled five-dollar bills amounting in total to about five hundred dollars. After completing his participation in the investigation at the Blockbuster store, Detective Cook proceeded to the location of Kim Brown's apartment. He indicated to Brown that the police were in the process of obtaining search warrants to search her residence, as well as her vehicle. Eventually, Brown provided a written consent to search the apartment and the vehicle. Nonetheless, the police impounded the vehicle and searched it later pursuant to a search warrant. During the search of Brown's apartment, the police found a bag described as a "Peavey" bag. In it they found currency in similar denomination bills, and similar amounts, as those taken from Blockbuster. A black coat similar to the one described by the victims of the robbery was also found in the apartment. Additional testimony revealed that in an open storage closet near the apartment, the police found a black gorilla mask and another BB pistol (in addition to the one later recovered from the Suburban). The search of the Suburban uncovered a BB pistol, a black shaving kit that contained three one-dollar bills, and a pair of black shoes. Also found in the vehicle were a hundred dollar bill and 14 five-dollar bills. As noted above, McClelland was arrested at the scene of the apartment, but Kim Brown was not arrested that night.

[¶ 13] Coleman Sanders, an acquaintance of McClelland and a friend of Kim Brown's, testified at trial. He also worked at Blockbuster, but he was also going to work for McClelland at a teen dance party to earn extra money. McClelland and Kim Brown had planned a dance party for 17–19 year-olds as a way to make money. During a discussion with McClelland, Sanders related that Blockbuster could take in a couple thousand dollars a night. McClelland then quizzed Sanders about whether or not Blockbuster had surveillance cameras (it did not).

[¶ 14] Patricia Patterson testified that Kim Brown rented the apartment involved in this case in late July of 2004. She elaborated that an inquiry was made to add McClelland as a tenant, but the paperwork was never returned. Brown was evicted from the apartment in mid-November of 2004.

[¶ 15] McClelland exercised his right not to testify in his own behalf. However, Kim Brown testified and desisted from her initial claims that neither she nor McClelland were involved in the robbery. She related in detail that the two of them planned and executed the robbery. Much of her testimony was corroborated by the evidence set out in summary above, although she did provide details that conflicted with some of the other testimony. Brown was convicted of being an accessory to robbery, sentenced to a term of imprisonment and placed on probation. She then reconciled with her husband and returned to her family and was pregnant with the couple's third child at the time of trial.

[¶ 16] This Court granted numerous extensions of time in which to file appellate briefs to both parties. The case matured for argument on October 30, 2006, with the filing of the State's brief. The case was argued to the Court on December 13, 2006, and taken under advisement on that date.

## DISCUSSION

### Suppression of Evidence Seized from Shared Apartment

 [¶ 17] Whether an unreasonable search or seizure occurred in violation of constitutional rights presents a question of law and is reviewed *de novo*, e.g., *Bailey v. State*, 12 P.3d 173, 177–78 (Wyo.2000).

[¶ 18] This issue comes to the Court in an unusual posture. As noted above, McClelland did not file a motion to suppress evidence. The search McClelland challenges is the search of the apartment rented by Brown, but occupied by both of them at the time the crime at issue was committed. The search at issue took place on the night of October 31–November 1, 2004. McClelland asks that we apply a decision issued by the United States Supreme Court on March 22,

2006, to the instant case. That decision is *Georgia v. Randolph,* 547 U.S. 103, 126 S.Ct. 1515, 164 L.Ed.2d 208 (2006), and we take note that Justice Souter delivered the opinion of the Court, in which Justices Kennedy, Ginsburg and Breyer joined. Justices Breyer and Stevens each filed a concurring opinion. Chief Justice Roberts filed a dissenting opinion, in which Justice Scalia joined. Justices Scalia and Thomas filed dissenting opinions and Justice Alito took no part in the consideration or decision of the case. *Id.,* at 1518.

[¶ 19] We would be required to give that decision retroactive application in order to reach the result suggested by McClelland. However, we decline to address whether we should give the Randolph case retroactive effect here, because that issue was not briefed by McClelland and because the issue was not developed as a matter of fact below. We are satisfied that the Randolph decision is not applicable to the circumstances of this case, to the extent those circumstances were made clear during trial.

[¶ 20] McClelland's contention is that when the police encountered Brown and McClelland outside their apartment, instead of seeking consent from both Brown and him, they obtained consent from Brown only, while separating him from Brown so that his protestation of the search could not be heard. As our point of embarkation, we note that no such facts appear in this record. The record most clearly reflects that McClelland was arrested when he was encountered by the police because they had probable cause to believe that he had committed a felony. Brown was not arrested at that time because the police did not have knowledge that she was a participant in the crime. The record is clear that they wanted to separate Brown and McClelland so that Brown and McClelland could not hear what one another was saying to the police, i.e., so they could not conspire to tell consistent stories. Nothing in the record suggests that McClelland was separated from Brown so as to frustrate his objections to a search of the apartment. McClelland did not come forward with any facts to that effect below and he makes no effort to suggest such facts exist in this appeal.

[¶ 21] In *Randolph,* the police were summoned to the Randolphs' marital residence because of a domestic dispute involving the couple's child. The Randolphs were separated and Mrs. Randolph had moved to Canada to reside with her family. However, she had returned to the Americus, Georgia, residence, "though the record does not reveal whether her object was reconciliation or retrieval of remaining possessions." When police arrived, Mrs. Randolph complained that her husband was a cocaine user. Mr. Randolph arrived at the home a short time later after taking their child to a neighbor's house out of concern that his wife would take the child out of the country again. He denied cocaine use, but accused Mrs. Randolph of abusing alcohol and drugs. The police assisted Mrs. Randolph in retrieving the child, at which time she repeated her accusation that there was evidence of drug use in the house. A police officer asked Mr. Randolph for permission to search, but he unequivocally refused. Mrs. Randolph gave her consent for a search and she directed the police to "his" bedroom where they found a straw with suspected cocaine. The police then obtained a warrant to search and additional incriminating evidence was found. Randolph moved to suppress the evidence as the product of a warrantless search of his house unauthorized by his wife's consent, over his express refusal. The trial court denied the motion to suppress. *Id.,* at 1519.

[¶ 22] The *Randolph* decision has nuances that make describing its exact reach difficult. Of this much we are certain. So long as the *Randolph* decision represents the law of the land, the police must honor the denial of consent to search, by a cotenant who is present and protests the search. Another cotenant may not override that refusal with his/her consent. The facts necessary to call the *Randolph* case into play are not present here. We conclude that the rule articulated in the *Randolph* decision does not apply to the circumstances presented by this case.

**Habitual Criminal Evidence**

■ [¶ 23] The standard of review for this issue is abuse of discretion. *Lopez v. State*, 2006 WY 97, ¶ 24, 139 P.3d 445, 454 (Wyo.2006):

> Evidentiary rulings are within the sound discretion of the trial court and include determinations of the adequacy of foundation and relevancy, competency, materiality, and remoteness of the evidence. This Court will generally accede to the trial court's determination of the admissibility of evidence unless that court clearly abused its discretion. We have described the standard of an abuse of discretion as reaching the question of the reasonableness of the trial court's choice. Judicial discretion is a composite of many things, among which are conclusions drawn from objective criteria; it means exercising sound judgment with regard to what is right under the circumstances and without doing so arbitrarily or capriciously. In the absence of an abuse of discretion, we will not disturb the trial court's determination. The burden is on the defendant to establish such an abuse.

*Gabbert v. State*, 2006 WY 108, ¶ 24, 141 P.3d 690, 697 (Wyo.2006) (citing *Brown v. State*, 2005 WY 37, ¶ 12, 109 P.3d 52, 56 (Wyo. 2005)).

[¶ 24] Wyo. Stat. Ann. § 6–10–203(c) (LexisNexis 2005) provides: "In a trial under this article, a duly authenticated copy of the record of previous convictions and judgments against the defendant of any court of record are prima facie evidence of the previous convictions and may be used in evidence against the defendant." In *Abeyta v. State*, 2003 WY 136, ¶¶ 26–27, 78 P.3d 664, 671 (Wyo.2003) we provided this summary of much of the pertinent law:

> [W]here prior convictions are alleged in order to seek enhancement of a sentence, two questions of fact are generally presented. The first is whether a pertinent prior judgment has been rendered, and the second is whether the person named in the prior judgment is the accused presently before the court. *Chavez v. State*, 604 P.2d 1341, 1350 (Wyo.1979), cert. denied, 446 U.S. 984, 100 S.Ct. 2967, 64 L.Ed.2d

841 (1980). *See also Singer v. United States*, 278 F. 415, 420 (C.C.A.3), cert. denied, 258 U.S. 620, 42 S.Ct. 272, 66 L.Ed. 795 (1922).

> Prior convictions can be established through documentary evidence such as the admission of authenticated copies of prison records, admission of authenticated copies of judgments of conviction and sentence from courts in Wyoming or from courts in other states, by the admission and use of copies of certified prison fingerprint records, or by a defendant's admission of such convictions. *Chavez*, 604 P.2d at 1350; *Waxler v. State*, 67 Wyo. 396, 224 P.2d 514, 521 (1950). Evidence of identity can be in the form of admission or confession of the defendant, photographs, similar birth dates and places, similar social security numbers or other identification numbers, certified fingerprint cards from prior arrests testified to by a fingerprint classifier to be those of the defendant, testimony of a prison official relative to his records, or by any of the usual methods for determining identity. *Chavez*, 604 P.2d at 1351.

*Also see Amin v. State*, 695 P.2d 1021, 1028–31 (Wyo.1985).

[¶ 25] The Wyoming Rules of Evidence explicitly deal with the concerns that McClelland raised in the trial court and that he iterates in this appeal:

**Rule 901. Requirement of authentication and identification.**

(a) *General Provision.*—The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.

(b) *Illustrations.*—By way of illustration only, and not by way of limitation, the following are examples of authentication or identification conforming with the requirements of this rule:

. . . .

(7) Public Records or Reports.—Evidence that a writing authorized by law to be recorded or filed and in fact recorded or filed in a public office, or a purported public record, report, statement, or data

compilation, in any form, is from the public office where items of this nature are kept.

## Rule 902. Self-authentication.

(a) Extrinsic evidence of authenticity as a condition precedent to admissibility is not required with respect to the following:

(1) *Domestic Public Documents under Seal.*—A document bearing a seal purporting to be that of the United States, or of any state, district, commonwealth, territory, or insular possession thereof, or the Panama Canal Zone, or the Trust Territory of the Pacific Islands, or of a political subdivision, department, officer, or agency thereof, or an Indian tribe recognized by the United States, and a signature purporting to be an attestation or execution;

(2) *Domestic Public Documents Not Under Seal.*—A document purporting to bear the signature in his official capacity of an officer or employee of any entity included in paragraph (1) hereof, having no seal, if a public officer having a seal and having official duties in the district or political subdivision of the officer or employee certifies under seal that the signer has the official capacity and that the signature is genuine.

(3) *Foreign Public Documents.*—A document purporting to be executed or attested in his official capacity by a person authorized by the laws of a foreign country to make the execution or attestation, and accompanied by a final certification as to the genuineness of the signature and official position (A) of the executing or attesting person, or (B) of any foreign official whose certificate of genuineness of signature and official position relates to the execution or attestation or is in a chain of certificates of genuineness of signature and official position relating to the execution or attestation. A final certification may be made by a secretary of embassy or legation, consul general, consul, vice consul, or consular agent of the United States, or a diplomatic or consular official of the foreign country assigned or accredited to the United States. If reasonable opportunity has been given to all parties to investigate the authenticity and accuracy of official documents, the court may, for good cause shown, order that they be treated as presumptively authentic without final certification or permit them to be evidenced by an attested summary with or without final certification.

(4) *Certified Copies of Public Records.*—A copy of an official record or report or entry therein, or of a document authorized by law to be recorded or filed and actually recorded or filed in a public office, including data compilations in any form, certified as correct by the custodian or other person authorized to make the certification, by certificate complying with paragraph (1), (2), or (3) of this rule or complying with any Act of Congress or rule prescribed by the Supreme Court pursuant to statutory authority.

. . . .

(b) *Lack of record.*—A written statement that after diligent search no record or entry of a specified tenor is found to exist in the records designated by the statement, authenticated as provided in subdivisions (a)(1) and (a)(2) of this rule in the case of a domestic record, or complying with the requirements of subdivision (a)(3) of this rule for a summary in the case of a foreign record, is admissible as evidence that the records contain no such record or entry.

(c) *Other proof.*—This rule does not prevent the proof of official records or of entry or lack of entry therein by any other method authorized by law.

(d) *Seal dispensed with.*—In the event any office or officer, authenticating any documents under the provisions of this rule, has no official seal, and so certifies, then authentication by seal is dispensed with.

## Rule 903. Subscribing witness' testimony unnecessary.

The testimony of a subscribing witness is not necessary to authenticate a writing unless required by the laws of the jurisdiction whose laws govern the validity of the writing.

[¶ 26] The evidence offered and admitted during the habitual criminal phase of McClelland's trial was all admissible under the governing statute, the applicable rules of evidence, and the jurisprudence of this state as it relates to the proof of the status of habitual criminal. Every exhibit offered and admitted was authenticated in one or more of the manners authorized by the applicable law. The objections made by McClelland at trial, and pursed in this appeal, relate only to the weight of the evidence and not its admissibility.

### Cumulative Error

■ [¶ 27] The doctrine of cumulative error is frequently raised as an issue in criminal appeals. We have recognized it as an issue that may have some utility in the appeals process. *See Schmunk v. State,* 714 P.2d 724, 745 (Wyo.1986) (although the decision in that case is, at best, splintered). A quick review of our cases that address such matters reveals that most often it is not a fruitful theory. The cumulative error analysis' purpose is to address whether the cumulative effect of two or more individually harmless errors has the potential to prejudice the defendant to the same extent as a single reversible error. Of course, in the equation we only consider matters that are determined to be errors, not matters that are asserted as error but determined to not be erroneous. *U.S. v. Harlow,* 444 F.3d 1255, 1269 (10th Cir.2006). Further, in *Alcala v. State,* 487 P.2d 448, 462 (Wyo.1971) we concluded: "It may be that reversal could be required in a case where there is a series of errors, no one of which is sufficiently prejudicial alone. However, that could occur only when the accumulated effect constitutes prejudice and the conduct of the trial is other than fair and impartial."

■ [¶ 28] McClelland points to a series of incidents that he asserts, when aggregated, constitute reversible error. The first of these occurred during the testimony of John Brown, a police officer at the time of this crime and probably the central figure in McClelland's protestations of innocence based on mistaken identity and the existence of an effort to frame him for this crime. In his testimony, John Brown used the word "thug," while gratuitously elaborating on the question asked of him, i.e., had he ever seen McClelland. As a police officer, John Brown had apparently researched McClelland's past and knew of his considerable criminal history. Defense counsel objected on the ground of relevance. The district court, somewhat inexplicably, stated: "That was not a response elicited by a question of counsel, so I will let you sort it out in cross." Nothing more was said about that matter. Defense counsel did not request a curative instruction, and that might well have been a reasonable strategy so as not to overly emphasize that characterization of the defendant. Although the district court might well have been more accurate and diligent in its response to the objection, we do not view this incident as plain error.

■ [¶ 29] McClelland claims that Officer Thompson commented on the credibility of the testimony of the Blockbuster employees. This arose out of a more general discussion of police investigations into robberies such as the one at issue here. As noted earlier in the statement of facts, such robberies can be "inside jobs." Thompson's testimony was to the effect that the details employee Johnson gave ("feeling the cold metal of the gun") was something that he did not think sounded "made up." Thus, the context most strongly suggests that that elaboration was directed at the subject of whether Johnson might be a suspect, rather than that his testimony was, in a more general sense, credible. Moreover, defense counsel objected, and the district court thoroughly reminded the jury that they were the sole judge of the credibility of witnesses. Again, given the totality of these circumstances, we do not view this as an error.

■ A related concern arose during another of Officer Thompson's elaborations on an answer to a very limited question. When asked if he was the one who arrested McClelland, Officer Thompson responded: "Yes I did. Officer Cook came over and talked to him. There was no statement taken by me in my presence. Officer Henry told me that he, Aubrey McClelland, had committed the robbery at the Blockbuster and to take him

under arrest." No objection was interposed. McClelland contends that these incidents violated the rule we articulated in *Whiteplume v. State*, 841 P.2d 1332, 1337–1341 (Wyo. 1992). However, we view this case as one which comes most closely under the purview of our decision in *Mitchell v. State*, 2003 WY 160, ¶ 11, 81 P.3d 180, 183 (Wyo.2003):

> Since *Whiteplume*, our review of issues concerning opinion testimony has developed the following rules. We apply an error-per-se standard when a prosecutor has improperly elicited an opinion of either defendant's guilt or the truthfulness of a witness. *Taylor v. State*, 2001 WY 13 ¶ 21, 17 P.3d 715, ¶ 21 (Wyo.2001). When the prosecutor's question is not a signal for the witness's credibility-opinion-testimony and defense counsel did not object at trial the plain error standard, not the per se error standard, applies. *Dudley v. State*, 951 P.2d 1176, 1178–79 (Wyo.1998). When a prosecutor does not seek an opinion but an investigating officer's testimony supplies one, we review the record to determine if the officer is implying that he believed or held an opinion with respect to the victim's version of the events surrounding the assault. *Whiteplume*, 841 P.2d at 1339–40. If the officer intended to impliedly vouch for the truth of the victim's accusations, no corroborating evidence exists, and the central jury issue is the victim's credibility, we will find reversible error when our review of all of the circumstances demonstrates prejudice to the extent that our confidence in the verdict is undermined. *Id.* at 1340–41; *Dudley*, 951 P.2d at 1180.

■ [¶ 31] Circumstances such as those we address here call into play the plain error rule: "First, the record must clearly present the incident alleged to be error. Second, appellant must demonstrate that a clear and unequivocal rule of law was violated in a clear and obvious, not merely arguable, way. Last, the appellant must prove that he was denied a substantial right resulting in material prejudice to him." *Lopez v. State*, ¶ 18, 139 P.3d at 452–53. Although both of these incidents are more "arguable" than they are "obvious," we ultimately are compelled to conclude that they did not materially preju-

dice McClelland, under the totality of the circumstances presented in this case.

■ [¶ 32] During John Brown's testimony, the prosecutor engaged him in another ill-advised series of questions. Although we will not set out the entirety of that colloquy, it is evident that some of his answers suggested John Brown's belief that McClelland was guilty. The questions were poorly worded and John Brown's understandable hostility to McClelland, who had cohabited with his wife for several weeks, was evident. However, the district court sustained defense counsel's objections and ordered the challenged response stricken from the record. Given these remedial efforts of the district court, we decline to categorize this incident as error.

■ [¶ 33] McClelland contends that the district court erred in revoking McClelland's bond in front of the jury after he was found guilty of robbery, but before the jury resumed its fact finding role in the habitual criminal phase. In addition, during the presentation of evidence in the habitual criminal phase, the prosecutor asked a detention officer if he had seen McClelland ("Yes. He is in our detention facility."), and then followed that up by asking if McClelland was "being held at your detention facility right now?" The answer was that he was, ". . . while we are having this trial." No objections were raised by defense counsel. In *Taylor v. Kentucky*, 436 U.S. 478, 485, 98 S.Ct. 1930, 1934, 56 L.Ed.2d 468 (1978), the United States Supreme Court made clear that a criminal defendant is "to have his guilt or innocence determined solely on the basis of the evidence introduced at trial, and not on grounds of official suspicion, indictment, **continued custody,** or other circumstances not adduced as proof at trial." [Emphasis added.] *Also see generally, Asch v. State*, 2003 WY 18, ¶¶ 60–61, 62 P.3d 945, 964 (Wyo.2003). However, we think it is quite clear in context that the detention officer's testimony went only to his ability to identify McClelland for purposes of the identity prong of the habitual criminal burden of proof placed on the State. To the extent it had any prejudicial effect whatever, no objection was made and no admonitory instruction was requested. Un-

der these circumstances we will not categorize it as plain error or as having any other prejudicial effect on the fairness of the trial.

[¶ 34] McClelland's final issue asserts that the State offered Exhibits 4 and 5 during the penalty phase, but that they were never admitted into evidence. Furthermore, it is contended that such a circumstance is an error meriting reversal. This purported error results from a misunderstanding of the record. All of the documents contained in those two exhibits were also contained in other exhibits that were admitted. They were detached from those exhibits and used, for the apparent purposes of convenience and clarity, in presenting the habitual criminal phase evidence. No error exists in this regard.

[¶ 35] We conclude that none of the matters catalogued by McClelland constitute error and, hence, we decline to apply the cumulative error rule.

## CONCLUSION

[¶ 36] Kim Brown's consent to search the apartment that was her joint residence with McClelland was not obtained in violation of governing constitutional principles. The evidence admitted at the habitual criminal phase of McClelland's trial was competent, and objections made to it at trial went to its weight, not its admissibility. The concept of cumulative error does not require reversal of McClelland's conviction. The judgment and sentence of the district court are affirmed in all respects.