2010 WY 100

**Donald Lee ROLLE, Appellant (Defendant),**

v.

**The STATE of Wyoming, Appellee (Plaintiff).**

No. S–09–0086.

Supreme Court of Wyoming.

July 16, 2010.

Representing Appellant: Michael H. Reese, Contract Appellate Counsel, of Michael H. Reese, P.C., Cheyenne, Wyoming.

Representing Appellees: Bruce A. Salzburg, Wyoming Attorney General; Terry L. Armitage, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; Graham M. Smith, Assistant Attorney General. Argument by Mr. Smith.

Before KITE, C.J., and GOLDEN, HILL, VOIGT *, and BURKE, JJ.

VOIGT, Justice.

[¶ 1] Donald Lee Rolle (the appellant) seeks to overturn his convictions for first-degree murder, felony murder, and kidnapping. He asserts numerous claims of error.

*Chief Justice at time of oral argument.*

Finding no abuse of discretion or prejudicial error, we affirm.

## ISSUES

[¶ 2] 1. Did the district court abuse its discretion when it admitted certain uncharged misconduct evidence?

2. Did the district court commit plain error when it did not give a limiting instruction immediately after the introduction of the uncharged misconduct evidence, but rather waited until the close of evidence, when defense counsel requested the instruction?

3. Did a question asked by the jury, and the judge's response thereto, result in a fatal variance, an improper instruction by the judge, or indicate that there was insufficient evidence to support a first-degree murder conviction?

4. Was the appellant's defense counsel ineffective?

5. Did cumulative error occur?

## FACTS

[¶ 3] On the evening of November 3, 2007, the appellant and Jennifer Randel went to Butch's Bar in Evansville, Wyoming. The appellant and Ms. Randel were together despite the fact that the appellant had been ordered, as a condition of his probation, not to have contact with Ms. Randel. Witnesses said that at one point the appellant attempted to initiate a physical altercation with another patron, but was restrained by bouncers. Shortly thereafter, the appellant and Ms. Randel left the bar, with a witness hearing the appellant say to Ms. Randel "get the f[——] up let's go, we're getting the f[——] out of here." Ms. Randel's response was "why, what did I do wrong."

[¶ 4] At approximately 9:34 p.m., that same night, a 911 call was received from Ms. Randel stating she was being held against her will in the appellant's vehicle. At one point during the call, there were sounds of a struggle and then Ms. Randel stated "you are going to kill me." Later, a male voice identified as that of the appellant stated, "I'm

going to cut your f[——] eyes out." The call lasted approximately nine minutes, then ended abruptly. Local law enforcement attempted to find Ms. Randel throughout the evening with no success.

[¶ 5] The next morning, a local rancher reported a vehicle stuck off an unimproved dirt road in a remote portion of Natrona County. Law enforcement responded and discovered the appellant's truck, with the appellant outside the vehicle with blood on his clothing. When the appellant saw the officers, he retreated to his vehicle and the officers observed the appellant begin to slash at his wrists. The officers eventually removed the appellant from his vehicle and detained him. Inside the vehicle they found the body of Ms. Randel, who was deceased.

[¶ 6] An autopsy showed that Ms. Randel had suffered numerous abrasions, contusions, and lacerations. Ms. Randel also suffered a stab wound in the back of her neck, multiple defensive wound[1] cuts on her hands, two rib fractures, a broken nose, and bruises across her limbs. However, the most serious trauma was to Ms. Randel's head. There was swelling and extensive bruising and lacerations resulting from "many, many blows" to the head and neck. Additionally, patches of hair had been pulled from Ms. Randel's scalp, and her body showed signs of manual strangulation. The autopsy revealed that Ms. Randel died from swelling of the brain resulting from blunt force trauma to the head.

[¶ 7] The appellant was tried and convicted by a jury of premeditated first-degree murder, felony murder, and kidnapping. The appellant timely appealed from those convictions. We will affirm.

## DISCUSSION

### Did the district court abuse its discretion when it admitted certain uncharged misconduct evidence?

[¶ 8] The admissibility of evidence of uncharged misconduct must be determined within the confines of W.R.E. 404(b), which rule reads as follows:

(b) *Other crimes, wrongs, or acts.*—Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident . . . .

The test that district courts must follow when determining the proper application of this rule and admissibility of uncharged misconduct evidence was adopted in *Vigil v. State*, 926 P.2d 351, 357 (Wyo.1996), *holding modified by Howard v. State*, 42 P.3d 483, 484 (Wyo.2002), and later articulated as follows:

Admissibility under W.R.E. 404(b) is not limited to the purposes set forth in the rule, and we have adopted a liberal approach toward admitting uncharged misconduct evidence. The listed exceptions are illustrative rather than exclusive. Nevertheless, because uncharged misconduct evidence carries an inherent danger for prejudice, we have also adopted a mandatory procedure for testing its admissibility: (1) the evidence must be offered for a proper purpose; (2) the evidence must be relevant; (3) the probative value of the evidence must not be substantially outweighed by its potential for unfair prejudice; and (4) upon request, the trial court must instruct the jury that the similar acts evidence is to be considered only for the proper purpose for which it was admitted. We do not apply this test on appeal; rather, it is intended to be conducted by the trial court.

. . . .

For proper appellate review of the admissibility of evidence under W.R.E. 404(b), the record must reflect that the trial court required the State not only to identify the proper purpose for which uncharged misconduct evidence is being offered, but also to explain how or why it is

1. The physician describing Ms. Randel's injuries to the jury described "defensive wound" as a "[a] defense wound, this would indicate a sharp knife, which the subject probably was trying to evade or walk away from the stab wound."

probative, and why it is more probative than prejudicial .... To make sure there is no doubt in the future that this is a required process, we will repeat it now, in the body of this opinion:

In determining the probative value of prior bad acts evidence, the trial court should consider the following factors:

1. How clear is it that the defendant committed the prior bad act?

2. Does the defendant dispute the issue on which the state is offering the prior bad acts evidence?

3. Is other evidence available?

4. Is the evidence unnecessarily cumulative?

5. How much time has elapsed between the charged crime and the prior bad act?

Evidence is unfairly prejudicial if it tempts the jury to decide the case on an improper basis. In balancing against its probative value the unfair prejudice created by the evidence, the trial court should consider the extent to which the evidence distracts the jury from the central question whether the defendant committed the charged crime. The trial court should weigh these additional factors against the probative value of the evidence:

1. The reprehensible nature of the prior bad act. The more reprehensible the act, the more likely the jury will be tempted to punish the defendant for the prior act.

2. The sympathetic character of the alleged victim of the prior bad act. Again, the jury will be tempted to punish the defendant for the prior act if the victim was especially vulnerable.

3. The similarity between the charged crime and the prior bad act. The more similar the acts, the greater is the likelihood that the jury will draw the improper inference that if the defendant did it once, he probably did it again.

4. The comparative enormity of the charged crime and the prior bad act. When the prior act is a more serious of-fense than the charged crime, the introduction of that act will tend to place the defendant in a different and unfavorable light.

5. The comparable relevance of the prior bad act to the proper and forbidden inferences. Evidence of the prior bad act may be much more probative of bad character than it is of any legitimate inference permitted by Rule 404(b).

6. Whether the prior act resulted in a conviction. The jury may be tempted to punish the defendant if they believe he escaped punishment for the prior bad act.

*Gleason v. State*, 2002 WY 161, ¶¶ 18, 27, 57 P.3d 332, 340, 342–43 (Wyo.2002) (citations omitted).[2]

 [¶ 9] Our standard of review when examining a district court's determination concerning the admissibility of uncharged misconduct evidence is as follows:

We review claims of error concerning the improper admission of W.R.E. 404(b) evidence for abuse of discretion and will not reverse the trial court's decision absent a clear abuse. *Thomas v. State*, 2006 WY 34, ¶ 10, 131 P.3d 348, 352 (Wyo.2006). A trial court abuses its discretion when it could not have reasonably concluded as it did. *Id.* In this context, "reasonably" means sound judgment exercised with regard to what is right under the circumstances and without being arbitrary or capricious. *Id.*

*Bromley v. State*, 2007 WY 20, ¶ 8, 150 P.3d 1202, 1206–07 (Wyo.2007). Even if we determine that a district court abused its discretion in improperly allowing admission of uncharged misconduct evidence, and thus the evidence was admitted in error, we must also determine whether the error was prejudicial. *Solis v. State*, 981 P.2d 34, 36 (Wyo.1999). "Error is prejudicial if there is a reasonable possibility that the verdict might have been more favorable to the defendant if the error had not been made." *Vigil v. State*, 2010 WY 15, ¶ 11, 224 P.3d 31, 36 (Wyo.2010).

---

**2.** It is perhaps appropriate to note that there is some "tension" between our prior statements that we have adopted a liberal approach toward admitting uncharged misconduct evidence, and our required application of specific procedures prior to such admission. We reiterate here that those procedures are mandatory.

[¶ 10] Prior to trial, the appellant filed a demand for notice of the State's intent to use uncharged misconduct evidence, and the appropriate hearing was held. Following the hearing, the district court issued a decision letter specifically addressing each item of uncharged misconduct evidence. The district court excluded certain items proffered by the State; however, it also determined that much of the uncharged misconduct evidence noticed by the State would be admissible.

[¶ 11] The appellant now argues that "[t]he introduction of 404(b) evidence is but a smokescreen to have evidence of Mr. Rolle's propensity to assault women and men and otherwise be a person with violent tendencies and consequently he should be convicted of first degree murder." While the appellant makes broad assertions of error and discusses the general dangers associated with the admission of uncharged misconduct evidence, in his appellate argument he only specifically takes exception to the testimony of one individual—D.G. D.G. was one of the appellant's former girlfriends. In his brief, the appellant claims:

> In this case the prejudice is so clear that the jury could generalize from the testimony of just [D.G.] that [the appellant] is prone to violence and is highly and physically abusive, although her testimony would suggest only when drinking. Such testimony infers violent predisposition because which [sic] effectively negates the presumption of innocence.

[¶ 12] The State responds that the district court took great care to analyze every piece of evidence individually under the *Gleason/Vigil* test, relying heavily on prior precedent that recognized similar evidence as admissible under 404(b). The State then argues that if the authority relied upon by the district court is still good today, then surely the district court did not abuse its discretion by following that precedent.

[¶ 13] In order to determine whether the district court abused its discretion in allowing D.G.'s testimony, we must examine the nature of the testimony as presented to the district court. The appellant did not object at trial to the admission of D.G.'s testimony, therefore we will examine the testimony as proffered in the State's Notice of Intent to Offer Evidence Pursuant to Rule 404(b). Before examining the proffer, we note that with the exception of evidence the district court refused to allow, D.G.'s in-court testimony was consistent with the State's proffer. The State described D.G.'s proposed testimony as follows:

> [D.G.] was in an intimate relationship with [the appellant] from February, 1992 to February, 1994 and again from approximately December of 1994 to December of 1995. In interviews with police, [D.G.] described an incident during the first time she was with [the appellant] when she and [the appellant] had been at a local business when a man who had hung a door for her said hello to her. [The appellant] went into a jealous rage and assaulted the man for no apparent reason. In the summer of 1993, [the appellant] became angry when he had been drinking because [D.G.] and her children would not ride with him. While at [D.G.]'s home he grabbed her by the neck and began choking her then pushed her into the bathtub causing her to strike her head. On January 13, 1994, [D.G.] became involved in an argument with [the appellant]. [The appellant] repeatedly told [D.G.] to hit him. She did eventually and then [the appellant] called the police. As [D.G.] left the room, [the appellant] punched her in the back of the head. [A police officer] responded to the call and arrested both of the parties and found a knot on the back of [D.G.]'s head. [The appellant] was convicted of battery but the conviction was reversed due to technical issues with the charging document. Thereafter, [the appellant] entered a plea of guilty to the charge and adopted the supporting documents in the case as factual basis. [The appellant] admitted during the trial that he had pushed [D.G.] but could not explain how a push resulted in a goose egg on the back of [D.G.]'s neck. Attachment 25. [D.G.'s] ... son, saw [the appellant] punch her in the back of the head. He also observed that [the appellant] was often verbally abusive to both himself and [D.G.]. See Attachment 26.

[D.G.] would also testify that during times they were apart [the appellant] would destroy her property. There was insufficient evidence at the time to prosecute but [the appellant] later admitted to [D.G.] that he was responsible for the damage. Jennifer Randel experienced similar problems with [the appellant] throughout their relationship. On February 25, 1994, and on other occasions, [the appellant] contacted [D.G.] in violation of court orders. She reported further damage to her vehicles on February 18, 1996, and reported that [the appellant] had admitted past acts of vandalism. See Attachment 27. The second incident occurred just after she had applied for an order of protection similar to Randel's. He left notes in a mailbox calling her a slut. He harassed her when she was out in public. Finally, in December of 1995, he began cursing her and finally kicked her out of the car on the interstate. He then proceeded to drive the vehicle at her and the children. . . . Even his dog wasn't exempt from [the appellant]'s abuse. He would beat the dog until it bled. [D.G.] report[ed] instances of verbal and physical abuse, as well as property destruction in the 1996 affidavit. To this day, [D.G.] is terrified by [the appellant].

The State argued for the admissibility of D.G.'s testimony as follows:

The [appellant] is fond of portraying Jennifer Randel as a crazy woman who he was victimized by on multiple occasions. . . . However, the [appellant]'s claims of being the victim of Randel as the first aggressor and his claim of accident make his relationships with other women particularly relevant to intent, motive and lack of mistake. In fact, this is how [the appellant] has presented himself since 1989 in his relationships. . . .

. . . .

More specifically regarding D.G.'s testimony, the State contended:

The similarities between the situations and Jennifer Randel and [D.G.] are persuasive evidence of [the appellant]'s motive and intent as well as a clear repudiation of his ridiculous story that he is somehow a victim and that his murder of Jennifer Randel

was an accident. . . . [D.G.] described how [the appellant] would provoke an attack so he could strike back.

[¶ 14] The district court addressed the admissibility of D.G.'s proposed testimony in its decision letter:

The State of Wyoming's notices and supplemental notices of uncharged misconduct evidence also includes a listing of evidence concerning relationships of [the appellant] with women other than Jennifer Randel, and instances of threats, assaults, and destruction of property allegedly perpetrated by [the appellant] against those women. The other crimes, wrongs, or acts listed in this category are reported to have occurred from 1989 to 1996. The listed evidence includes a variety of conduct attributable to [the appellant], with several of the incidents lacking facts comparable to the alleged kidnapping and homicide in this case, but a number of incidents being factually comparable to the alleged events of November 2007 involving Jennifer Randel.

Evidence of specific acts of violence may generally be admissible in a homicide case. *Buhrle v. State*, 627 P.2d 1374, 1380 (Wyo. 1981). In the case of *Johnson v. State*, 936 P.2d 458, 465 (Wyo.1997), evidence of a defendant's prior assault of a live-in girlfriend was held to be probative of the charged assault on a current girlfriend because it suggested that he was violent toward the women with whom he lived. Perhaps even more applicable to the situation hereunder review, is the case of *Moore v. State*, [2003 WY 153, ¶¶ 18–23,] 80 P.3d [191,] 196–197 [ (Wyo.2003) ], wherein the Wyoming Supreme Court held that evidence of a defendant's prior abuse of a kidnapping victim was admissible to show that the defendant intended to control the actions of the victims and that he was capable of carrying out the threats he made to his victims. Finally, it is noted that case law indicates that uncharged misconduct directed toward a previous wife may be admitted for a proper purpose when the assaultive conduct is comparable to the situation for which the defendant is

standing trial. *Sandy v. State*, 870 P.2d 352, 357 (Wyo.1994).

Although the above-cited legal authorities generally support the allowance of uncharged misconduct evidence similar to that noticed in the third category hereunder review, it is still necessary that the proper analysis be undertaken pursuant to Rule 404(b) of the Wyoming Rules of Evidence. In making the required analysis, the court is mindful of dangers of admitting such evidence and skeptical of its necessity, but should be willing to admit it when it is offered for a proper purpose that is material and not unduly prejudicial. *Solis v. State*, 981 P.2d 28, 37 [30] (Wyo. 1999).

The prosecution asserts that the noticed evidence of other wrongs, crimes or acts in the designated third category is offered to show motive, intent, course of conduct, and to rebut any claim of mistake or accident. The court would agree that the identified acts, as summarized in the State of Wyoming's notices concerning evidence of [the appellant]'s assaults on other women are proposed for introduction for proper purposes. The use of such evidence concerning a defendant's relationship with other women has been introduced in Wyoming cases for such purposes. *Kenyon v. State*, [2004 WY 100, ¶ 24,] 96 P.3d 1016, 1026 (Wyo.2004); and *Wilson v. State*, 14 P.3d 912, 918 (Wyo.2000). More specifically, as noted in the case of *Johnston [Johnson] v. State*, 936 P.2d 458 (Wyo.1997), evidence of domestic conflict may be proper to show motive regarding the charged crimes. In any event, the noted instances of [the appellant]'s threats, assaults, and destruction of property directed towards other women are offered for proper purposes in this case.

As with the testing of the other categories of noticed uncharged misconduct evidence in this case, it is necessary for the court to determine whether that evidence is more probative than prejudicial considering the *Gleason* factors. The following is this court's analysis in evaluating the probative value of the noticed other acts evidenced in this category and the weigh-

ing of the additional facts against the probative value of such evidence:

*a. Factors re: Probative Value of Prior Acts Evidence.*

1. How clear is it that the defendant committed the prior acts? It is clear that there is proposed direct testimony to indicate that [the appellant] committed the uncharged misconduct in this category. The submittals of the prosecution assert that testimony will be presented by eye witnesses to the listed incidents. Additionally, there are corroborative statements and documentation of several of the prior acts listed by the State of Wyoming in this category.

2. Does the defendant dispute the issue on which the State is offering the prior acts evidence? It does appear that the defense disputes the issues of intent, motive, and absence of mistake or accident upon which the State of Wyoming is offering the noticed other acts evidenced in this category.

3. Is other evidence available? As previously noted, there is some other proposed evidence relating to the issues of intent, motive, and absence of mistake or accident, but it is difficult to quantify such other evidence based upon the information provided.

4. Is the evidence unnecessarily cumulative? Some of the proposed evidence in this category may be cumulative to some degree, but it would not appear that the evidence as outlined in the State of Wyoming's listing would be unnecessarily cumulative.

5. How much time has elapsed between the charged crime and the prior acts? The prior acts in this category occurred between 1989 to 1999.... The alleged assaultive behavior of [the appellant] directed at [D.G.] is alleged to have occurred in the time frame from 1993 to 1995.... With the exception of the alleged assaultive behavior of 1989, it does not appear that the subject acts in this category are overly remote to the charged crime in this case.

### b. Additional Facts to Weigh Against the Probative Value of the Prior Acts Evidence.

1. The reprehensible nature of the prior acts. The noticed uncharged misconduct evidence in this category would be classified as reprehensible in nature. Several of the noticed factual matters, however, would not be of such seriousness to conclude that a jury would be tempted to punish the defendant for such other acts. An exception to this finding would be the reprehensible nature of the allegations relating to [the appellant]'s conviction for possession of a sawed-off rifle in the State of Montana given the alarming nature of such offense.

2. The sympathetic character of the alleged victim of the prior acts. There would be some component of sympathy relative to the alleged victims of the noticed 404(b) evidence in this category.

3. The similarity between the charged crimes and the prior acts. There are several similarities between the alleged other acts and the identified evidence in the events surrounding the kidnapping and homicide charged in this case. Such similarities include the allegations of [the appellant]'s assaultive behavior, threatening statements, and violation of protective orders. Several of the asserted prior acts in this category, however, including [the appellant]'s description of [his ex-wife], the alleged assault of [the appellant] on a door repairman that said hello to [D.G.], and the alleged abuse by [the appellant] of his dog, would not have any substantial similarity to the charged crimes in this case.

4. The comparative enormity of the charged crimes and the prior acts. The alleged prior acts in this category are substantially less serious than the charged crimes in this case.

5. The comparative relevance of the prior acts to the proper and forbidden inferences. Generally, the proposed uncharged misconduct evidence in this category is comparably relevant to the proper and legitimate purposes of proving motive, intent, and absence of mistake or accident. Exceptions to this finding would be the noticed evidentiary items concerning [the appellant]'s description of [his ex-wife], the alleged assault of [the appellant] on a door repairman that said hello to [D.G.], and the alleged abuse by [the appellant] of his dog, which matters would appear to have little comparative relevance.

6. Whether the prior acts resulted in a conviction. The identified January 13, 1994 assault upon [D.G.], and the 1999 possession of a sawed-off rifle in violation of an order of protection issued to [another ex-girlfriend] are identified to have resulted in convictions. None of the other noticed crimes, wrongs, or acts in this category resulted in any identified conviction.

Giving consideration to the above-listed factors, the court concludes that with the exceptions hereinafter noted, the evidence of [the appellant]'s relationships with [two other individuals], and [D.G.], including instances of threats, assaults, and destruction of property, as set forth in the State of Wyoming's Rule 404(b) notices meets the admissibility requirements under 404(b) of the Wyoming Rules of Evidence.

[¶ 15] As can be seen, the district court earnestly endeavored to apply the *Gleason/Vigil* test. It appears that the district court carefully examined and considered the proffered evidence, and then clearly and specifically stated that the evidence was properly admissible to show motive, intent, course of conduct, and to rebut any claim of mistake or accident.[3] Additionally, in making that determination, the district court relied upon a number of cases wherein this Court determined that similar evidence was properly admissible. Finally, the district court addressed the relevance and probative value of the evidence by examining those concepts within the framework established in our prior precedent.

[¶ 16] The appellant does not claim that a procedural error occurred in the admission of the uncharged misconduct evidence. Also,

---

**3.** We have held that 404(b) analysis does not require pinpointing only one purpose for the admission of such evidence. *Sturgis v. State*, 932 P.2d 199, 203 (Wyo.1997).

the appellant does not refute (or even discuss) any of the cases cited by the district court or otherwise assert that the evidence was not admitted for a proper purpose. In fact, other than the general allegation quoted above regarding the prejudicial effect of the admission of D.G.'s testimony, the appellant undertakes no specific relevancy or prejudicial effect analysis. *See supra* ¶ 11.

[¶ 17] Our task in reviewing a district court's decision on the admissibility of uncharged misconduct evidence is to determine whether the district court abused its discretion, not to apply the *Gleason/Vigil* test anew. *Gleason*, 2002 WY 161, ¶ 18, 57 P.3d at 340 ("We do not apply this test on appeal; rather, it is intended to be conducted by the trial court."). When reviewing for an abuse of discretion, we are bound by the principle that "as long as there exists a legitimate basis for the trial court's ruling, that ruling will not be disturbed on appeal." *Leyva v. State*, 2007 WY 136, ¶ 17, 165 P.3d 446, 452 (Wyo.2007) (quoting *Sanchez v. State*, 2006 WY 116, ¶ 20, 142 P.3d 1134, 1140 (Wyo. 2006)). "It is well established that deference is given to a trial judges rulings as to the admissibility of evidence; as long as there is some reasonable basis for his conclusions, this court will not second-guess him on appeal." *Hopkinson v. State*, 632 P.2d 79, 101 (Wyo.1981).

[¶ 18] Our review of the analysis undertaken and authority relied upon by the district court, as set forth in its decision letter, convinces us that the district court had a legitimate and reasonable basis for its ruling on the admissibility of [D.G.]'s testimony, as well as the other proposed evidence of uncharged misconduct. Thus, we conclude that the uncharged misconduct evidence admitted in this case was admitted for one or more proper purpose under W.R.E. 404(b), that the district court adequately performed the pretrial analysis required by *Gleason* and *Vigil* to determine the relevance of the evidence, and that the district court properly balanced the probative nature of the evidence against its potential for unfair prejudice. The district court did not abuse its discretion in admitting the evidence.

*Did the district court commit plain error when it did not give a limiting instruction immediately after the introduction of the uncharged misconduct evidence, but rather waited until the close of evidence, when defense counsel requested the instruction?*

[¶ 19] The appellant next argues that the district court committed plain error when it failed to give a limiting instruction both at the time the uncharged misconduct evidence was admitted and at the end of trial when instructing the jury. We have previously reviewed a similar case under the plain error standard of review. *Connolly v. State*, 610 P.2d 1008, 1011 (Wyo.1980) (district court failed to give a limiting instruction contemporaneous to the admission of uncharged misconduct evidence). In *Connolly*, the focus of our analysis was on the second element of the plain error test; that is, whether the alleged error resulted in the transgression of a clear and unequivocal rule of law. That will likewise be our focus here.

[¶ 20] At the end of the district court's decision letter, quoted in part and discussed in the previous section of this opinion (*see supra* ¶ 14), the court made the following comment:

Upon request, the court will instruct the jury that as to all uncharged misconduct evidence found to have met the criteria of Rule 404(b), it be considered only for the proper purpose or purposes for which it is admitted. *Vigil v. State*, 926 P.2d 351, 357 (Wyo.1996). It is requested that the parties, in advance of trial, submit for the court's consideration all proposed limiting instructions concerning the admission of evidence of other crimes, wrongs, or acts.

At trial, no objection was made or limiting instruction requested or given regarding admissibility of the uncharged misconduct evidence. At the end of trial, and at the beginning of the jury instruction conference, the court stated:

The Court notes for the record that in its decision letter as to the 404(b) evidence proposed by the State, the Court did include an advisement that it would give a limiting instruction at any time requested by the Defense; and during the trial pro-

ceedings, I think I reiterated that offer. And it wasn't until the end of the case and the submittal of the jury instructions that the Defense has requested the 404(b) instruction, and that will be given as requested by the Defense.

[¶ 21] The appellant now takes exception to the fact that no limiting instruction was given contemporaneously with the admission of the uncharged misconduct evidence, suggesting that a rule currently exists requiring dual instructions when admitting such evidence. As support for this argument, the appellant points to a number of cases wherein federal courts required such a procedure. For example, in *United States v. Rivera*, 837 F.2d 906, 913 (10th Cir.1988), the Tenth Circuit Court of Appeals stated:

> If evidence is admitted solely under the authority of Rule 404(b), the court must give a limiting instruction both at the time the evidence is admitted and in the general charge to minimize the danger that the jury might use the evidence as proof that the defendant acted in conformity with his past acts on the occasion for which he is being tried.

[¶ 22] While this statement appears compelling at first blush, the appellant's use of the authority and accompanying argument is flawed. All of the federal authority cited by the appellant predates the case of *Huddleston v. United States*, 485 U.S. 681, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988).[4] In *Huddleston*, the United States Supreme Court determined the protection afforded by F.R.E. 105, which rule only requires a limiting instruction to be given "upon request," was sufficient to guard against the possibility of undue prejudice created by the admission of uncharged misconduct evidence. 485 U.S. at 691–92, 108 S.Ct. at 1502. Following *Huddleston*, the Tenth Circuit backed away from its mandatory requirement of both a contemporaneous limiting instruction and one at the close of the case. In *United States v. Record*, 873 F.2d 1363 (10th Cir.1989), the Tenth Circuit reviewed an appeal in which the appellant did not receive an additional limiting instruction at the close of evidence, only a contemporaneous instruction. *Id.* at 1373.

On appeal, he claimed this was a violation of the rule articulated in the above-quoted *Rivera* case. *Id.* at 1373–74. The Tenth Circuit proceeded to review this rule in light of the *Huddleston* decision. *Id.* at 1374. The court determined that, as United States Supreme Court precedent, *Huddleston* was controlling and that "in the wake of *Huddleston* it is not error for a trial court to fail to instruct the jury ... in the absence of a proper request by counsel." *Id.* at 1376. As a result, the Tenth Circuit has stated that although the dual-limiting instruction method is the preferred method in the circuit, it is not mandatory. *United States v. Harrison*, 942 F.2d 751, 760 (10th Cir.1991).

[¶ 23] Likewise, this Court rejected the dual-instruction requirement. In *Connolly v. State*, 610 P.2d 1008 (Wyo.1980), we found that the district court did not err in failing to give a limiting instruction following the admission of uncharged misconduct evidence where none was requested, stating:

> To charge the trial court with the duty of protecting defendants right to receive a limiting instruction, thereby relieving the attorney of that obligation, would be an exercise in role-switching which we are not ready to condone, and which would, in any case, be contrary to the procedural responsibilities contemplated by Rule 105, W.R.E.,....

*Id.* at 1011.

[¶ 24] Given this federal and state precedent, we cannot say that it was error for the district court not to give a contemporaneous limiting instruction upon admission of uncharged misconduct evidence where none was requested.

***Did a question asked by the jury, and the judge's response thereto, result in a fatal variance, an improper instruction by the judge, or indicate that there was insufficient evidence to support a first degree murder conviction?***

[¶ 25] The appellant raises three issues that he claims arise out of, or in relation to, a question submitted by the jury. During de-

4. The *Rivera* decision was issued on January 20, 1988. *Huddleston* was issued on May 2, 1988.

liberations, the jury sent the following question to the judge:

> We, the jury, would appreciate any and all information you could provide us with in assisting us in determining the differences between 1st and 2nd degree murder. More specifically, a definition of "maliciously" and examples of "pre-meditated malice." Thank you for your consideration. The Jury.

In response to this question, the judge stated

> I believe we're all in agreement that the jury should be referred back to Instruction 10 with respect to the elements of premeditated murder in the first degree and Instruction 15, the elements of murder in the second degree. And the jury will need to be governed by those instructions in determining the differences.

### 1. Did the instruction result in a fatal variance?

[¶ 26] Two major precepts govern the law of variances. First, a variance occurs when the evidence presented at trial proves facts different from those alleged in the information or indictment. Second, a variance is not fatal—that is, it does not require reversal of a conviction—unless the appellant could not have anticipated from the indictment or information what evidence would be admitted at trial, or the conviction would not bar subsequent prosecution. *Spagner v. State*, 2009 WY 12, ¶ 15, 200 P.3d 793, 800 (Wyo.2009). The concept of a variance arises out of the Sixth Amendment to the United States Constitution, as well as Article 1, Section 10 of the Wyoming Constitution and W.R.Cr.P. 3, which provisions guarantee an accused the right to notice of the charges against him and a right for that notice sufficiently to inform him of the specific charges against which he must defend. *Spagner*, 2009 WY 12, ¶ 10, 200 P.3d 793, 798–99. To ensure this right,

> [t]hese constitutional provisions and the procedural rule require that an information (1) contain the elements of the offense charged; (2) fairly inform a defendant of the charges against which he must defend; and (3) enable a defendant to plead an acquittal or conviction in bar of future prosecutions for the same offense.

*Id.* at ¶ 10, 200 P.3d at 799. In interpreting these requirements, this Court has held "that an information is sufficient if it is 'in the words of the statute.'" *Id.* at ¶ 11, 200 P.3d at 799.

[¶ 27] "Because the right to notice of criminal charges is of constitutional magnitude and the determination on the adequacy of the notice is a question of law, we review the issue *de novo.*" *Id.* at ¶ 10, 200 P.3d at 799.

[¶ 28] Without citing any supporting authority, the appellant points to the jury's question and states: "Confusion is certainly one of those considerations this Court considers when discussing whether a variance is applicable because the jury did not understand the jury instructions which interfered with its ability to 'properly' understand the separate elements of each crime" and "this discrepancy between the evidence and jury instruction is a proper reflection of what a variance means." The appellant is attempting to argue the existence of a variance where the facts clearly do not support such.[5] The Information here was drafted in the words of the statute. Additionally, the Information identified the approximate location, approximate time frame, and the specific victim of this crime. Consequently, the appellant was fully and fairly informed of the charges and, if acquitted, was subject to a bar of future prosecutions for the death of Jennifer Randel. At trial, the State continued on this course and presented evidence showing that the appellant purposely and with premeditated malice killed Jennifer Randel sometime between November 3, 2007, and November 4, 2007, in Natrona County, Wyoming. The jury's question and possible confusion had no bearing on the adequacy of the notice provided to the appellant of the charges against him, nor did it indicate that

---

5. A close reading of the appellant's brief suggests that his actual argument is that the evidence was only sufficient to convict him of the lesser included offense of manslaughter, which argument would be more appropriate in the context of a sufficiency of the evidence argument.

the evidence at trial demonstrated facts different from those alleged in the information. No variance occurred here.

### 2. *Did the district court fail properly to instruct the jury?*

[¶ 29] As described above, the jury sent the judge a question asking for clarification on the difference between first-degree and second-degree murder. *See supra* ¶ 25. Specifically, the jury asked the judge to define "maliciously" and to give examples of pre-mediated malice. In response, the judge directed the jury to the instructions setting forth the elements of those crimes and stated that the jury would need to be governed by those instructions in determining the difference. The appellant now asserts that the judge improperly answered the jury's question and that this error interfered with the jury's ability to understand or examine the separate elements of each crime. He summarizes his argument as follows:

> The jury requested a definition of "maliciously" and was not provided such a definition other than to refer to the definition of "malice." The jury reasonably confused the two terms. By directing the jury to a definition embodied in the statute of First Degree Murder the Court has in fact left the jury with no room to maneuver and so the guilty verdict in the first degree was logical inference in the chain of first degree inferences.

[¶ 30] Our standard of review when examining jury instructions is as follows:

> [W]hen an appellant does not object at trial to the jury instructions . . . our review of this issue follows our plain error standard:
>
> > First, the record must clearly present the incident alleged to be error. Second, appellant must demonstrate that a clear and unequivocal rule of law was violated in a clear and obvious, not merely arguable, way. Last, appellant must prove that he was denied a substantial right resulting in material prejudice against him.

*Six v. State*, 2008 WY 42, ¶ 12, 180 P.3d 912, 917 (Wyo.2008). We review and analyze jury instructions as a whole and do not single out individual instructions or parts thereof. *Id.* We give trial courts great latitude in instructing juries and " 'will not find reversible error in the jury instructions as long as the instructions correctly state the law and the entire set of instructions sufficiently covers the issues which were presented at the trial.' " *Ogden v. State*, 2001 WY 109, ¶ 8, 34 P.3d 271, 274 (Wyo.2001) (quoting *Harris v. State*, 933 P.2d 1114, 1126 (Wyo.1997)). More specifically with regard to a judge's duty to respond to a jury question, we have said that "jury questions revealing confusion or a lack of understanding should be answered." *Heywood v. State*, 2007 WY 149, ¶ 29, 170 P.3d 1227, 1235 (Wyo.2007).

[¶ 31] We begin our discussion of this issue by noting that the jury's written question and the judge's response thereto are both clearly reflected in the record, thus satisfying the first prong of plain error analysis. Next, we turn to whether a clear and unequivocal rule of law was violated. The error alleged by the appellant is that the judge failed to provide the jury with a definition of "maliciously." Although made many years ago, the following statement by this Court is particularly pertinent to the issue presented here.

> We are cited to numerous cases where it has been held that a failure of the court to state a pertinent legal principle, when it has not been requested, is not error; as for instance, a failure to define the terms, "malice," "reasonable doubt," or the like. But the distinction is plain. If counsel desire to have the jury instructed more in detail than the court may deem necessary, they must ask for such instructions; otherwise it is reasonable to presume they concurred with the court in the opinion that the jury was sufficiently informed as to such matters.

*Palmer v. State*, 9 Wyo. 40, 49, 59 P. 793, 796 (1900). After the judge responded to the jury's question by directing them to the instruction setting forth the elements of first-degree and second-degree murder, the appellant neither objected to the judge's response nor requested additional instruction. Likewise, the jury did not present further ques-

tions. Thus, we can reasonably assume that the judge's response adequately addressed any confusion the jury may have had.

[¶ 32] Although our analysis of this issue might well end here, because the jury's question expressed some level of confusion, we will briefly examine the issue further to ensure that the instructions sufficiently covered the issues presented at trial. Specifically, we will review whether the judges failure to define "maliciously" was error under these circumstances. We have said that "a trial court is under no obligation to define a statutory term unless the term carries a technical connotation different from its everyday meaning." *Ewing v. State*, 2007 WY 78, ¶ 9, 157 P.3d 943, 946 (Wyo.2007). "A term must only be defined if the correct legal definition is such a departure from ordinary meaning that the jury would misunderstand its application to the circumstances before it." *Id.* As used in this statute, the term "maliciously" does not appear to have any technical meaning beyond the definition of "malice" given in Instruction No. 13, or outside of its ordinary connotation:

#### INSTRUCTION NO. 13

YOU ARE INSTRUCTED that "Malice" means that the act(s) constituting the offense charged was/were done intentionally, without legal justification or excuse or that the act(s) was/were done in such a manner as to indicate hatred, ill-will, or hostility towards another.

The common definition of "maliciously" is "given to, marked by, or arising from malice." *Webster's Third New International Dictionary* 1367 (3d ed 1993). Therefore, we conclude that the instructions accurately stated the law and sufficiently covered the issues presented at the trial.

3. **Was there sufficient evidence to support the first-degree murder conviction?**

[¶ 33] At the end of the previous two arguments, the appellant adds the following statement: "In the alternative if this Court were to decide that no variance exists, we would submit that there is a lack of evidence to find [the appellant] guilty of murder in the first degree." This comment is the extent of his argument on the question of the sufficiency of the evidence. We have "consistently refused to consider claims not supported by cogent argument or citation to pertinent legal authority." *Forbis v. Forbis*, 2009 WY 41, ¶ 10, 203 P.3d 421, 424 (Wyo.2009). We will follow that principle here.

### *Was the appellant's defense counsel ineffective?*

[¶ 34] "The issue of ineffective assistance of counsel involves mixed questions of fact and law, and is reviewed *de novo.*" *Proffit v. State*, 2008 WY 114, ¶ 33, 193 P.3d 228, 241 (Wyo.2008). The rules governing our review of trial counsel's effectiveness, which rules originate from the United States Supreme Court case of *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984), are as follows:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Proffit*, 2008 WY 114, ¶ 33, 193 P.3d at 241. When reviewing such claims "[w]e invoke a strong presumption that counsel rendered adequate and reasonable assistance making all decisions within the bounds of reasonable professional judgment." *Gist v. State*, 737 P.2d 336, 342 (Wyo.1987). "The burden is upon the defendant to overcome this presumption that, in light of the circumstances, the challenged action or failure of the attorney might be considered sound trial strategy." *Dickeson v. State*, 843 P.2d 606, 609 (Wyo.1992).

[¶ 35] Appellant contends his trial counsel was ineffective for: (1) failing to request a

limiting instruction regarding the State's uncharged misconduct evidence at the time that evidence was introduced; (2) failing to object to the content of the uncharged misconduct limiting instruction; and (3) failing to object to the qualifications of certain witnesses who were, or allegedly could have been, considered experts. We will address each of the claims in turn.

### 1. Failure to request contemporaneous uncharged misconduct limiting instruction.

[¶ 36] The appellant asserts that defense counsel was ineffective in failing to request a limiting instruction contemporaneously with the admission of the uncharged misconduct evidence. We have said "[c]ounsel may, as a matter of trial strategy, choose not to request a limiting instruction in order to avoid emphasizing the unfavorable evidence." *Beintema v. State*, 936 P.2d 1221, 1228 (Wyo.1997). Furthermore, where the district court had no duty, absent a request, to fashion a limiting instruction we have held that "the decision to request, or refrain from requesting, a limiting instruction is a tactical decision that this court will not second guess." *Chapman v. State*, 2001 WY 25, ¶ 22, 18 P.3d 1164, 1174 (Wyo.2001).

[¶ 37] As discussed above, the district court was not required to give a contemporaneous limiting instruction. Before trial, defense counsel was informed by the district court that it would give a limiting instruction if requested. Defense counsel was fully aware of which witnesses would be testifying to uncharged misconduct. Although defense counsel never requested a contemporaneous limiting instruction, the instruction addressing the uncharged misconduct evidence given during the instructions phase was drafted and submitted by the appellant. The appellant offers no evidence that the failure to request, or decision not to request, a contemporaneous limiting instruction was anything other than trial strategy to mitigate the effect of the uncharged misconduct evidence. As such, we find that the appellant fails to overcome the strong presumption that coun-

sel rendered adequate and reasonable assistance in this regard.

### 2. Failure to object to content of limiting instruction.

[¶ 38] The appellants next claim relates to defense counsels failure to object to the adequacy of the limiting instruction regarding the uncharged misconduct evidence given to the jury at the end of the trial. The instruction, drafted and submitted by the appellant, read as follows:

You have heard evidence about prior acts committed by [the appellant] against Jennifer Randel, [and two other girlfriends]. The Court permitted the State of Wyoming to introduce this evidence for the purpose of showing the [appellant]s motive, intent, the relationship of the parties, lack of mistake or accident, and to show a course of conduct between [the appellant] and Jennifer Randel. You are hereby instructed that you may not consider this as evidence of the [appellant]s bad character and that he acted in conformity therewith on the night of November 3rd and 4th, 2007. You may only consider this evidence to bear on the issues of the [appellant]s motive, intent, the relationship of the parties, lack of mistake or accident and to show a course of conduct between [the appellant] and Jennifer Randel.

[¶ 39] The appellant asserts that the instruction only applied to prior acts committed against Jennifer Randel and two other of the appellants prior girlfriends. The appellant then argues that other individuals testified to uncharged misconduct, and failure of the instruction specifically to include each of those individuals was prejudicial to the appellant because the jury could have reasonably assumed that other testimony was beyond the scope of the limiting instruction. Although the appellant claims that defense counsels failure to provide a more comprehensive jury instruction was prejudicial, he does not point to a single instance of uncharged misconduct evidence that was admitted, yet not covered by the limiting instruction.[6] Therefore, the appellant fails in his

---

6. The appellant does make reference to one individual not listed in the instruction who testified

burden to demonstrate how he was, or even could have been, prejudiced by his defense counsels failure to object to the jury instruction. Because we are unable to discern any prejudice arising from the instruction, it is unnecessary to address the matter further. *Floyd v. State*, 2006 WY 135, ¶ 13, 144 P.3d 1233, 1238 (Wyo.2006) ("If we conclude that a defendant fails to satisfy the prejudice prong, we need not address the performance of counsel prong.").

### 3. Failure to voir dire "expert" witnesses.

[¶ 40] Finally, the appellant argues that defense counsel was ineffective because he failed to object to the qualifications of certain witnesses who were, or allegedly could have been, considered experts. The appellant argues that trial counsel should have challenged the credentials of the Crisis Intervention Services director (CIS director), who testified about patterns of behavior in domestic violence. The appellant also argues that the person who transcribed the 911 call was not qualified to give expert opinion about certain sounds heard in the 911 call.

[¶ 41] An attorney's failure or refusal to *voir dire* an expert witness is not *per se* ineffective performance. *Saenz v. State*, 103 S.W.3d 541, 546 (Tex.Ct.App.2003) ("[N]either the rule nor the case law creates a presumption of error if counsel fails to request *voir dire* [of an expert witness]."); *see also Kimbrough v. State*, 886 So.2d 965, 982 (Fla.2004). In order for the failure to *voir dire* an expert witness to constitute reversible ineffective assistance, the appellant bears the burden of showing the testimony would likely have been inadmissible under *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). *See Montez v. State*, 2009 WY 17,

¶¶ 23–26, 201 P.3d 434, 441–42 (Wyo.2009) [7]; *see also Wright v. State*, 765 N.W.2d 85, 92 (Minn.2009). Therefore, in addressing this claim, we must first determine if the expert testimony is "sufficiently established to have gained general acceptance in the particular field in which it belongs," and only if the evidence fails that test should we determine "whether there is a reasonable probability that 'but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Williamson v. State*, 994 So.2d 1000, 1010–11 (Fla.2008) (quoting *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2069).

[¶ 42] When testifying, the CIS director explained her qualifications and experience, and then stated:

Q. Have you had occasion also to testify about that in the courts of the State of Wyoming?

A. Yes, I have.

Q. Is that both civil and criminal cases?

A. Yes, sir.

Q. Have you testified for both the defense and the prosecution?

A. Yes, sir.

Q. In fact, have you been qualified as an expert witness in this area in this court?

A. In Natrona County District Court with Judge Park, yes, sir.

On appeal, the appellant undertakes no effort to demonstrate that the CIS director would not have qualified as an expert under *Daubert*, or to demonstrate how defense counsel's failure to object to the expert testimony resulted in prejudice. After our own review of the record, including the testimony as to the qualifications of the CIS director and the relevance of her testimony, we find that she was adequately qualified as an expert and

---

that he received 200 stitches in his face after the appellant hit him with a beer glass in a 1993 barroom altercation. However, that individual only testified during the sentencing phase of the trial, and therefore the district court's ruling did not apply to his testimony.

7. One of the issues stated in *Montez* read as follows: "Did trial counsel provide ineffective assistance by failing to object to portions of law enforcement officers' testimony on the ground that such was expert testimony that was inadmissible under *Daubert v. Merrell Dow Pharmaceuti-*

*cals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)?" 2009 WY 17, ¶ 23, 201 P.3d at 441. However, we did not reach the issue of whether an ineffective assistance claim arises where a trial counsel fails to challenge an expert on *Daubert* grounds because we concluded that no prejudice could have resulted from one witness's testimony and that the other witness's opinion was a lay opinion, not subject to *Daubert*-type analysis. *Id.* at ¶¶ 24, 26, 201 P.3d at 441–42.

that her testimony was such that it assisted the jury. Furthermore, we have previously recognized that the type of testimony offered by the CIS director is proper expert testimony under similar circumstances. *See Kenyon v. State,* 2004 WY 100, ¶¶ 21–23, 96 P.3d 1016, 1025 (Wyo.2004). In short, the appellant has not shown that any effort by defense counsel to exclude the testimony of the CIS director would have been successful, and thus has not shown that defense counsel's failure to *voir dire* her constituted ineffective assistance of counsel.

[¶ 43] The appellant's final claim of ineffective assistance of counsel involves the testimony of the individual who transcribed Ms. Randel's 911 call. In her testimony, the transcriptionist described what she surmised to be a "hitting noise" and speculated that the reason the victim's voice was muffled at one point in the recording was due to "the phone [being] very close to the caller's face." The appellant claims that such subjective descriptions either approximated an expert opinion—which the transcriptionist was allegedly unqualified to give—or invaded the province of the jury. Accordingly, the appellant now claims it was ineffective assistance when counsel failed either to move to have the witness disqualified as an expert or otherwise to move to exclude her testimony. This argument, however, ignores the actions that counsel did take.

[¶ 44] The record reflects that trial counsel objected to the subjective statements in the transcript and the qualifications of the transcriptionist. Such actions by trial counsel demonstrate that he was trying, as best he could, to exclude the subjective statements in the transcript. As a compromise, the judge ruled that the transcript would be given to the jury only when the audio recording played and would be collected immediately after, so the jurors would not have access to it during their deliberations. The record shows the transcripts were collected when the witness was excused. Also, the judge specifically cautioned the jury that although the transcript was going to be provided while the jury listened to the recording, "It is only to be an aid to you in your consideration of the evidence, and you need to rely upon your own hearing and your own perception of the

911 call in connection with your actual evaluation of your use of that evidence." Finally, trial counsel requested permission and was allowed to conduct a *voir dire* examination of the witness about what expertise "enable[d] [her] to accurately say what's on a recording above that of anybody else" and, later, extensively cross-examined her about the fact that her subjective statements merely reflected her interpretation of what certain recorded sounds conveyed, which was not the only possible interpretation. In such a circumstance, it is unclear what other actions the appellant wishes his trial counsel would have taken. He states that "[c]ounsel failed to object to such testimony based upon a failure to vet expert witnesses through the *Daubert* process." On the contrary, trial counsel did question the transcriptionist about whether she had an ability to recognize the sounds on an audiotape beyond that possessed by anyone else and then renewed his objection to the admissibility of her transcription.

[¶ 45] Considering all of the facts and circumstances surrounding the admission of the 911 call transcription, and in light of trial counsel's efforts to exclude admission of that evidence, we cannot say that trial counsel's performance was deficient; that is "counsel made errors so serious that counsel was not functioning as the counsel guaranteed [appellant] by the Sixth Amendment." *Montez,* 2009 WY 17, ¶ 3, 201 P.3d at 436 (quoting *Frias v. State,* 722 P.2d 135, 145 (Wyo.1986)).

### Did cumulative error occur?

[¶ 46] In his final issue, the appellant argues that this Court should reverse his conviction as a result of the cumulative effect of all the errors made during his trial. The purpose of evaluating for cumulative error is "to address whether the cumulative effect of two or more individually harmless errors has the potential to prejudice the defendant to the same extent as a single reversible error." *McClelland v. State,* 2007 WY 57, ¶ 27, 155 P.3d 1013, 1022 (Wyo.2007). In conducting a cumulative error evaluation, we consider only matters that we have determined to be errors. *Id.* We will reverse a conviction only when " 'the accumulated effect [of the errors] constitutes prejudice and the con-

duct of the trial is other than fair and impartial.' " *Id.* (quoting *Alcala v. State*, 487 P.2d 448, 462 (Wyo.1971)). *Guy v. State*, 2008 WY 56, ¶ 45, 184 P.3d 687, 701 (Wyo.2008). Because we have found that no individual errors occurred, a claim for cumulative error cannot lie.

## CONCLUSION

[¶ 47] After careful consideration of the appellant's claims, we conclude that: (1) the district court properly followed the *Gleason/Vigil* test for determining the admissibility of the uncharged misconduct evidence and we cannot say that the court abused its discretion in admitting testimony concerning the appellant's prior uncharged misconduct; (2) the appellant's claim that a court is required, without request, to give a limiting instruction contemporaneously with the introduction of uncharged misconduct evidence is not supported by law; (3) the appellant's claim that there was a variance between the facts alleged in the Information and those presented at trial is unsupported by the record; (4) the jury was adequately instructed on the difference between first-degree and second-degree murder, and on the meaning of the term "maliciously"; (5) the appellant failed to provide cogent argument or citation to pertinent authority regarding his claim that there was insufficient evidence to support his conviction for first-degree murder; (6) the appellant failed to show that defense counsel's failure to request, or decision not to request, a limiting instruction contemporaneously with the admission of uncharged misconduct evidence resulted in ineffective assistance; (7) the appellant failed to demonstrate any prejudice arising out of defense counsel's failure to object, or decision not to object, to the limiting instruction regarding the uncharged misconduct evidence; (8) the appellant's claim that defense counsel was ineffective for failing to *voir dire* certain "expert" witnesses is not supported by the record; and finally, (9) because we find no individual error or abuse of discretion, we conclude that cumulative error did not occur.

[¶ 48] Affirmed.